384 S.E.2d 816

**Ira DADISMAN, Chairman of the
Public Employees Retirement
System Assoc.**

v.

**Arch A. MOORE, Jr., Governor, et al.**

No. 18343.

Supreme Court of Appeals of
West Virginia.

Dec. 27, 1988.

Rehearing Granted and Opinion
Modified March 17, 1989.

George C. Duffield, Charleston, for appellant.

Kenneth E. Knopf, Asst. Atty. Gen., for the Governor.

Steven Herndon, Sol. Gen., for the Bd. of Public Works.

Silas B. Taylor, Deputy Atty. Gen., for the Legislature.

Webster J. Arceneaux, amicus curiae, American Federation of State, County and Municipal Employees.

McGRAW, Justice:

The Petitioner, a retirant and the Chairman of the Public Employees Retirement Association, brings this action based on this Court's original jurisdiction. He prays that we issue the necessary and appropriate writs which would insure the proper funding of the Public Employees Retirement System as well as require that the System be managed in such a way as to maintain the fiscal soundness of that System.

The Respondents include the highest officials of the executive and legislative branches of our State's government,[1] and we have given their arguments appropriately serious consideration. The Petitioner seeks writs of mandamus against these officials.[2] The Respondents mount numerous pleas and motions not connected with the merits of the cause of action and question the propriety or timing of the remedies sought. At common law, these pleas and motions could have been termed dilatory, because they aim to delay or defeat the present litigation, leaving the cause of action unsettled.

The Respondents do not argue that the Petitioner has no rights in this matter. Their arguments generally do not reach or impeach the central issues raised by the Petitioner. Rather, their arguments simply attempt to evade responsibility for prob-

---

1. On one of the issues addressed in part II of this opinion, the transfer of special revenue funds, and another issue in part III, the use of Retirement System monies to pay health insurance premiums, Respondent Treasurer Manchin has asked to be aligned with the Petitioner. Another Respondent, Auditor Gainer, does not object to an order of this Court enjoining the transfers for payment of insurance premiums.

These positions are taken by the Respondents in their respective roles of Treasurer and Auditor, not as members of the Respondent Board of Trustees.

2. We find that writs of prohibition are neither necessary nor appropriate in this case.

lems with the Retirement System. Where these arguments raise colorable procedural questions, we have addressed them in the relevant portions of this opinion. Where, however, the claims are specious, we have, in the interest of judicial efficiency, chosen not to respond to them individually.

■ Essentially, the Respondents variously contend that they are immune from this Court's original jurisdiction in this matter or that they have no power or duty relevant to the acts complained of by the Petitioner. "To entitle one to a writ of mandamus, the party seeking the writ must show a clear legal right thereto and a corresponding duty on the respondent to perform the act demanded." *State ex rel. Cooke v. Jarrell*, 154 W.Va. 542, 177 S.E.2d 214 (1970). Because we find no relevant immunity in the Respondents, clear rights of the Petitioner, and legal duties of the Respondents based on statute, contract theory, and trust obligations, we grant the Petitioner the writs of mandamus detailed hereafter, and order the Respondents to recognize and carry out their respective responsibilities to properly fund and manage the Retirement System.

## I. STATUTORY STRUCTURE

■ The Public Employees Retirement System (PERS) was created by statute, W.Va.Code §§ 5–10–1 *et seq.* (1987 Replacement Vol.), in 1961 to provide an orderly general retirement system for public employees. A review of the statute reveals a classic example of a "statutory" trust.

[A] "trust" is a legal relation between two or more persons by virtue of which one is bound to hold property to which he has the legal title, for the use or benefit of the other or others who have an equitable title or interest. It is a right, enforceable in equity, to the beneficial enjoyment of property, real or personal, of which the legal title is in another. The person so holding the legal title or interest is called the "trustee," and the one having the equitable interest and entitled to the benefit is the beneficiary or "cestui que trust." The person creating the trust is called the "trustor" or "settlor." An essential feature of trusts is the division of the title to property, the vesting of the legal title in the trustee and of the equitable title or beneficial interest in the cestui que trust.

R. Kimbrough, *Summary of American Law*, § 22:1 (1974). The "body corporate" of the public employees retirement system constitutes a trust. The terms of the trust contract are spelled out in the PERS statute. W.Va.Code § 5–10–1 *et seq.* Membership is mandatory for employees of participating public employers, W.Va.Code § 5–10–17(a),[3]. The members and their employers are the "trustors" or "settlors," and the retirants, active and deferred, and their survivors are "cestui que trust," entitled to the benefits of the trust. W.Va.Code §§ 5–10–20, 21, 22, 24, 25.[4]

When a public employee renders services he earns the employers' matching contribution to the retirement trust fund, and his contributions and these earned employer contributions, plus the accrued interest from both, constitute the corpus of the pension trust, and the retirement entitlements earned are deferred compensation for these public employees, *Wagoner v. Gainer*, 167 W.Va. 139, 153–154, 279 S.E.2d 636, 645 (1981); *see also Campbell v. Kelly*, 157 W.Va. 453, 462, 473, 202 S.E.2d 369, 378, 381 (1974).

The PERS Board of Trustees, currently made up of Respondents Gainer, Manchin, McCuskey, Fox, and Poundstone, has the responsibility of administering and managing the PERS, effectuating the statute. W.Va.Code § 5–10–5. The Trustees determine the amount of the mandatory "contribution" to be deducted from each employee's paycheck and paid to the PERS for the

---

**3.** Exceptions are working and contributing members of other public retirement systems. Legislators and legislative employees may elect to become members of PERS. W.Va.Code § 5–10–17(b) and (c).

**4.** Members leaving public employment have the right, on certain conditions, to rejoin the system and receive prior service credit. W.Va.Code § 5–10–18.

members' deposit fund (MDF).[5] W.Va. Code § 5–10–29. The Trustees are also involved in determining the amounts participating employers are required to contribute to the employers accumulation fund (EAF) in order to match the employees' contributions and ensure the actuarial soundness of the System, up to a statutory maximum of 10.5% of their payrolls.[6] W.Va.Code § 5–10–31. The statute additionally charges the Trustees to maintain, for financing and accounting purposes, a state division and a division for other public employers, each with the following five funds: (1) the MDF, (2) the EAF, (3) the retirement reserve fund, (4) the income fund, and (5) the expense fund. W.Va. Code § 5–10–28.

By the very use of the term "Trustee," as well as by the allocation of responsibilities to them, the Legislature has placed the Respondent Trustees in a fiduciary relationship with the PERS and its participants. Other courts examining the role of statutorily designated trustees judge their actions by the high standards to which fiduciaries are held. *See, e.g., Withers v. Teachers' Retirement System*, 447 F.Supp. 1248 (S.D.N.Y.1978), *aff'd.*, 595 F.2d 1210 (1979); *In re State Employees' Pension Plan*, 364 A.2d 1228 (Del.1976); *Weaver v. Evans*, 80 Wash.2d 461, 495 P.2d 639 (1972) (en banc). We conclude that the Respondent Trustees have the highest fiduciary duty to maintain the terms of the PERS trust, as spelled out in the statute.

The Board of Public Works was originally given the responsibility to invest available PERS funds as specified by Code § 5–10–38. This duty has since been assumed by the State Board of Investments, W.Va. Code § 12–6–13 (1985 Replacement Vol.), and its members, Governor Moore, Treasurer Manchin, and Auditor Gainer, are Respondents herein.

## II. APPROPRIATIONS

The Petitioner's fundamental argument is that, in recent years, PERS has not been properly funded, and has become actuarially unsound, perhaps soon requiring appropriation of general fund taxpayer dollars to meet the State's trust obligations to retirants. In order to judge the merits of the Petitioner's contention in this regard, it is necessary to examine the statutorily established funding process and compare it to actual events.[7]

### A. Recent Underfunding

Employees' contributions are automatically deducted from their paychecks. As a first step in the governmental funding process, the public employers' contributions, which have been earned for the trust through the employees' services, are actuarially determined, W.Va.Code § 5–10–31, and the Board of Trustees certifies this amount to the Governor, W.Va.Code § 5–10–32(a). The Governor then must include this amount in his appropriation bill as submitted to be considered by the Legislature. *Id.*[8]

In fiscal year 1984–85, the PERS Trustees certified a need for $12,000,000 in the state division employers accumulation fund (EAF) to match the contributions of employees whose compensation is paid from the general revenue fund. The Governor included $12,561,966 in his budget request as the amount earned for the trust by State employees, and the Legislature appropriated that same amount.

In fiscal year 1985–86, however, the Governor chose not to include the full $13,800,000 earned for the trust by State employ-

---

5. The amount of the current deduction is the statutory maximum of 4.5% of the member's compensation.

6. The actuarial assumption of financing sources in recent years has been an employer contribution of 9.5% of salaries.

7. In this comparison, the Court was greatly aided by the amicus curiae brief filed by an inter-ested labor union, the American Federation of State, County, and Municipal Employees.

8. The Respondent Commissioner of Finance and Administration plays an integral role in developing the Governor's proposed budget bill and, therefore, shares responsibility for including this amount in the bill submitted. *See* W.Va.Code § 5A–2–1 to –11 (1987 Replacement Vol.).

ees and certified to him by the Trustees, but instead again budgeted $12,561,966. The Legislature initially appropriated this amount, but, in February of that same fiscal year, House Bill 2000 "transferred and expired" [9] the $12,561,966 appropriation into the general revenue fund, along with certain employer contributions from special revenue funds, some of which apparently came from federal grants to state agencies.

In fiscal year 1986–87, the Trustees certified a need for $16,203,000 which had been earned for the trust by State employees. The Governor again budgeted $12,561,966. This time the Legislature appropriated *no* money for the EAF, instead requiring that employer contributions from certain special revenue funds, including some federal funds, again be paid to the PERS Trustees, who would then transfer those funds to the general revenue fund. In addition, House Bill 1082 directed that the Department of Highways "employer contributions usually transferred to [PERS] ... will be retained during fiscal year 1986–87 and expended for contract paving purposes."

In fiscal year 1987–88, the Governor did not include in his budget request any of the $13,639,555 the employees had earned for the trust which had been certified by the PERS Trustees. The Legislature first appropriated $7,544,677 to the EAF, but then once more "transferred and expired" that sum in February of the same fiscal year to the general revenue fund.[10]

In fiscal year 1988–89, the PERS Trustees certified that $14,250,000 had been earned for the trust, but neither the Governor nor the Legislature budgeted any money to the EAF. In addition, Senate Bill 5 directed that the employer contributions from *all* special revenue funds be paid into the general fund by the PERS Trustees.

Finally, the budget bill directed that retiree insurance premiums made necessary by the provisions of West Virginia Code § 5–16–12 (Supp.1988) be paid from member employee contributions, accumulated reserves, or investment income.[11]

The Respondent Trustees have, over the past four years, certified to the Governor a need for approximately fifty-five million dollars in general fund employer contributions which have not been deposited into the EAF. The amicus curiae brief estimates that between eighteen and twenty million dollars will be diverted from special revenue funds originally earmarked for the EAF in fiscal year 1988–89. An undetermined amount of special revenue employer contributions were diverted in fiscal years 1985–86 and 1986–87, in addition to the diversion of the Department of Highways pension contributions to contract paving in fiscal year 1986–87. The amicus union estimates that the EAF has been underfunded by some eighty million dollars.

### B. Duties of the Governor and Presiding Legislative Officers

The PERS Trustees, as was their statutory duty, certified to the Governor in each of the years in question the actuarially determined amounts to be contributed the EAF, based on the compensation earned by State employees for the trust fund. Contrary to the statute, however, the Governor did not include the amount so ascertained in the appropriations bills he submitted to the Legislature in fiscal years 1985–86, 1986–87, 1987–88, or 1988–89. This Court has said that "statutory law is the public policy statement of the people acting through the legislative branch of the re-

9. The appropriations contained in any budget bill are for the fiscal year named. "In general, money appropriated for a particular purpose, which remains unexpended and not contractually obligated at the expiration of the appropriation legislation, lapses, and become [sic] public revenue under the plenary control of the legislature." 63 Am.Jur.2d *Public Funds* § 47 (1984); *see State ex rel. Meyer v. Duxbury,* 183 Neb. 302, 160 N.W.2d 88 (1968). In West Virginia, the statute providing for the expiration of appropri-

ations may be found at Code § 12–3–12 (Supp. 1988).

10. Respondents neither admit nor deny these figures.

11. On October 7, 1988 this Court entered an order staying transfers of special revenue contributions into the general fund and of the questioned amounts for insurance premiums.

publican form of government. By the terms of our organic law the people are entitled to the benefit of law enacted by their legislative representatives." *Cooper v. Gwinn,* 171 W.Va. 245, 250, 298 S.E.2d 781, 786 (1981).

Code section 5–10–32(a) provides that the contribution amounts certified to the Governor by the PERS Trustees "shall be included in the appropriation bill to be submitted to the Legislature." It is well established that "[t]he word 'shall', in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Syl. Pt. 2, *Terry v. Sencindiver,* 153 W.Va. 651, 171 S.E.2d 480 (1969).

"A ministerial act or duty is one which is to be performed under a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to or exercise of the judgment of the one doing it upon the propriety of the act's being done." Syl. pt. 2, *Marcum v. Ballot Commissioners,* 42 W.Va. 263, 26 S.E. 281 (1896).

*Quoted in* Syl. Pt. 1, *DePond v. Gainer,* 177 W.Va. 173, 351 S.E.2d 358 (1986). The mandate of the statute, W.Va.Code § 5–10–32(a), creates a ministerial duty in the Governor to include the actuarially determined amounts of contributions earned for the trust by State employees to the PERS in his proposed budget submitted to the Legislature. It has long been the law in West Virginia that "[a] peremptory writ of mandamus will issue to require the discharge by a public official of a non-discretionary duty." Syl. Pt. 4, *Glover v. Sims,* 121 W.Va. 407, 3 S.E.2d 612 (1939). It is the duty of the Governor to prepare for the Legislature a budget consistent with statutory law and our Constitution, W.Va. Const. art. VI, § 51, and failure to do so supports issuance of a writ of mandamus. *See State ex rel. Brotherton v. Moore,* 159 W.Va. 934, 230 S.E.2d 638 (1976). The Governor, therefore, must hereafter include in his proposed budget an appropriation for the PERS at least equal to that certified to him by the Trustees. This represents payment to the trust for the services rendered by State employees.

Similarly, it is the duty of the Respondent Senate President and the Respondent Speaker of the House of Delegates, as presiding officers of their respective houses of the Legislature, to promptly introduce the budget bill submitted by the Governor, "in such form and detail ... *as may be prescribed by law.*" W.Va. Const. art. 6, § 51 B(4) (emphasis supplied).

The Legislative Respondents have chosen not to address the merits of the Petitioner's complaints. Instead, they have chosen to enter a "special appearance" primarily for the purposes of arguing their immunity from suit. Article six, section nineteen of our State's Constitution provides, in relevant part that "for words spoken in debate, or any report, motion or proposition made in either house, a member shall not be questioned in any other place," and the Respondents contend this provision extends to all their duties.

The Respondents argue thus, ignoring or incognizant of several rules of law which apply here. First, although immunity for discretionary acts is the general rule, it has long been established that "[m]ere ministerial duties of legislative officers, not involving the exercise of any discretion or of legislative functions, are frequently enforced by the courts by means of the writ of mandamus." Annotation, *Mandamus to Members or Officer of Legislature,* 136 A.L.R. 677 (1942). This Court has recognized that "Section 51, Article VI, West Virginia Constitution, commonly known as the 'Budget Amendment', is couched in mandatory terms, and clearly embraces a mandate of the electorate of this State governing the Legislature in the appropriation of funds." Syl. Pt. 2, *State ex rel. Trent v. Sims,* 138 W.Va. 244, 77 S.E.2d 122 (1953). The presiding officers' duty to introduce a budget bill as prescribed by law is stated in mandatory, rather than discretionary, terms, thus weakening any immunity argument.

Second, legislative immunity is a rule stated in general terms, while the duty to introduce the budget bill is stated in specif-

ic terms. It is a basic rule of construction that a specific law will be applied instead of a conflicting general law. Syl. Pt. 1, *UMWA v. Kingdon*, 174 W.Va. 330, 325 S.E.2d 120 (1984).

■ Finally, section fifty-one of article six of our Constitution declares, by its own terms that "[i]n the event of any inconsistency between any of the provisions of this section and any of the other provisions of the Constitution, the provisions of this section shall prevail." W.Va. Const. art. 6, § 51(13). During the years in question, the Governor's budget bill was not as "prescribed by law," because it did not include the amounts earned and ascertained according to Code sections 5–10–31 and –32. Therefore, the respondent President and Speaker should have refused to introduce an improperly prepared budget bill. It is the responsibility of the President of the Senate and the Speaker of the House of Delegates under article six, section fifty-one of our Constitution to take whatever steps are necessary, including the institution of a mandamus action, to ensure that the Governor's Budget Bill is as prescribed by law.

## C. Illegality of Failure to Appropriate Adequate Funds

In fiscal years 1986–87 and 1988–89, the Legislature failed to appropriate any general funds to meet the contributions required of the State, as earned for the trust by the work of State employees. In fiscal years 1985–86 and 1987–88, the Legislature "transferred and expired" the already insufficient appropriations into the general fund, again failing to meet the State's required contributions. These actions by the Legislature were improper and illegal. Further, the failure of the Respondent Trustees to act in the face of these illegal legislative maneuvers and their compliance in channeling pension trust dollars improp-

erly into the general fund are breaches of their fiduciary duties as Trustees.[12]

Because we find that the failure to properly fund PERS is improper as violative of statute, trust, and constitution, we discuss each of these theories in turn.

### 1. Statutory Violations

■ Section 32(a) provides that the contributions to be made by the State as an employer to PERS "shall be paid to the retirement system quarterly and when paid shall be credited to the employers accumulation fund." In none of the four years in question were the required quarterly payments made, thus violating Code § 5–10–32(a).

In 1985–86 and 1987–88, the expiration legislation was passed and effective in February of the same fiscal year as the appropriation. The transfer and expiration of funds undertaken by the Legislature was in violation of statute. West Virginia Code § 12–3–12 (Supp.1988) provides that appropriations remaining undrawn at the end of the fiscal year "shall be deemed to have expired at the end of the year for which it is made." The Respondents have cited no other constitutional or statutory provision authorizing the Legislature to expire funds. By the terms of Code § 12–3–12, appropriations may not be expired until the end of the fiscal year for which the appropriations are made; the actions of the Legislature to "transfer and expire" the pension trust fund appropriations, which represent moneys earned for the trust by State employees, prior to the end of the relevant fiscal years are invalid, unlawful, and void. It is fundamental to our constitutional law and we affirm that the Legislature cannot amend general substantive statutes with budgetary language. *Compare and contrast* W.Va. Const. art. VI, §§ 28–31 the procedure for enacting general law *with* W.Va. Const. art. VI, § 51 the procedure for enacting budget and supplementary appropriation bills. *Hechler v. McCuskey,*

**12.** In fact, we rhetorically ask again, as we did at the oral argument of this Petition, why didn't the Board of Trustees come to this Court years ago as a Petitioner rather than appearing now as a Respondent, culpable for the plunder of the funds placed in their trust? We acknowledged

in footnote one the Respondent Treasurer's position on the transfer of special fund contributions into the general fund and noted the fact that this position is not taken as a PERS Trustee.

179 W.Va. 129, 365 S.E.2d 793 (1987); *see* *O'Connor v. Margolin,* 170 W.Va. 762, 296 S.E.2d 892 (1982). The Legislature's improper expiration of the appropriations worked an expropriation from the PERS trust funds.

By February of each of those years, two quarters of the fiscal year had passed, and according to Code § 32(a), half of the funds appropriated as earned for the trust by State employees should have been paid to PERS and credited to the EAF.[13] The Respondent Trustees are charged with the management of PERS and the effectuation of the pension trust statute. W.Va.Code § 5–10–5. It is their statutory and fiduciary duty to have earned and appropriated funds drawn down in a timely fashion and to see that they are credited to the proper accounts.[14] The Respondents' failure to request payment of most of the funds appropriated for the first parts of the fiscal years 1985–86 and 1987–88 would have led to the loss to PERS of interest. In the face of the expiration legerdemaine, the result was the loss of the earned appropriations, as well the interest thereon.

### 2. Trust Violations

■ The Respondent Trustees did not draw down the appropriated funds, that is, the money earned for the trust by State employees, according to the statute. They did not question the Legislature's action when the pension trust fund's appropriation was expired contrary to statute even though they had been earned for the trust through services rendered. *Cf. In re State Employees' Pension Plan,* 364 A.2d 1228 (Del.Sup.1976). Finally, they actually cooperated with the Legislature's invasion of the EAF by receiving and then transferring to the general fund the employers' contributions earned by employees paid from special revenue funds, apparently including federal grant moneys specifically allocated for pension matching. All of these acts are violations of the Respondent Trustees fiduciary duties to the PERS and its participants.

It is clear from reading the PERS statute that the Board of Trustees have broad powers in administering and managing the various pension trust funds. W.Va.Code §§ 5–10–5 to –13. The PERS Board, "as trustee of retirement funds ... must dispose of them according to the law. The board has a fiduciary duty to protect the fund and the interests of all beneficiaries thereof, and it must exercise due care, diligence, and skill in administering the trust." 67 C.J.S. *Officers and Public Employees* § 244 (1978); *see Mount v. Trustees of the Public Employees' Retirement System of New Jersey,* 133 N.J.Super. 72, 335 A.2d 559 (1975). In the instant matters regarding funding of PERS, the Respondent Trustees, at best, have acted with gross negligence in failing to draw down earned and appropriated funds or protest lack of adequate appropriations as earned. At worst, the Respondent Trustees have acted in complicity to divert the employers' contributions earned by employees from special revenue funds into the general fund. Given these multiple breaches of fiduciary duties by the Respondent Trustees, they must take calculated steps necessary to recover these funds for the PERS.

### 3. Impairment of Contract

The acts of the various Respondents resulting in the inadequate funding of the PERS are also invalid because they violate the prohibitions against impairment of contract contained in the federal constitution, U.S. Const., art. I, § 10, cl. 1, and in our State's constitution, W.Va. Const. art. III, § 4. A statute is treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature. *United*

---

**13.** Although the expiration legislation seemed to be based on the assumption that all of the appropriated funds were available for transfer to the general fund, Exhibit 1 submitted by the Petitioner indicates that $2,489,512 of the $12,561,966 was drawn down in 1985–86 and $1,257,448 of the $7,544,677 was drawn down in 1987–88.

**14.** It is also the duty of the PERS spending officer to submit quarterly requests for allotments to the Respondent Commissioner of Finance and Administration. W.Va.Code § 5A–2–17 (1987 Replacement Vol.). We question the Respondent Commissioner's apparent continued silence when allotments from the appropriated funds were not requested in a timely fashion.

*States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 24, 97 S.Ct. 1505, 1519 n. 24, 52 L.Ed.2d 92 (1977); *see Barron v. Board of Trustees of Policeman's Pension & Relief Fund,* 176 W.Va. 480, 345 S.E.2d 779 (1985); *see also Waite v. Civil Service Commission,* 161 W.Va. 154, 241 S.E.2d 164 (1977). The state and federal contracts clauses limit the power of a state to modify its contracts with other parties. *U.S. Trust* 431 U.S. at 17, 97 S.Ct. at 1515.

We have held that "[a] 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syl.Pt. 3, *Waite,* 161 W.Va. 154, 241 S.E.2d 164. We have applied this concept of a property interest in pension cases. *Barron,* 176 W.Va. 480, 345 S.E.2d 779. In other jurisdictions, the modern trend and majority view is that a public employee's rights under a public pension statute are contract rights. 60A Am.Jur.2d *Pensions and Retirement Funds* § 1620 (1988); *see, e.g., Hanson v. City of Idaho Falls,* 92 Idaho 512, 446 P.2d 634 (1968); *Halpin v. Nebraska State Patrolmen's Retirement System,* 211 Neb. 892, 320 N.W.2d 910 (1982); *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467 (1980) (and cases cited therein); *State Teachers' Retirement Board v. Giessel,* 12 Wis.2d 5, 106 N.W.2d 301 (1960). A contrary ruling would contradict analogous rulings we have made in other pension cases. *DePond v. Gainer,* 177 W.Va. 173, 351 S.E.2d 358 (1986); *In re Dostert,* 174 W.Va. 258, 324 S.E.2d 402 (1984); *Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636; *see Campbell v. Kelly,* 157 W.Va. 453, 202 S.E.2d 369 (1974). Indeed, the respondent Governor and Commissioner conceed that the PERS statute creates such rights. We, therefore, now hold that retired and active PERS plan participants have contractually vested property rights created by the pension statute, and such property rights are enforceable and cannot be impaired or diminished by the State.

This Court has already considered the limitations on legislative action imposed by constitutional restrictions on the impairment of contracts, and has held as follows:

Legislative modifications to a pension plan must be reasonable, and the test for reasonableness is whether the alteration to the pension scheme serves to keep the system sound and flexible.... While the law recognizes that states retain some reserve power to modify by statute existing contractual [pension] relationships when the public interest so requires, such modifications must be reasonable and necessary to serve important public purposes. *Allied Structual Steel Co. v. Spannaus,* 438 U.S. 234, 242, 98 S.Ct. 2716, at 2721, 57 L.Ed.2d 727 (1978); *Marvel v. Danneman,* 490 F.Supp. 170, at 175 (D.C.Del.1980). It follows that when a statutory modification attempts to change important provisions of an existing contract outside the limits of the reserved state powers, the legislation will impair obligations of the contract and will be declared unconstitutional.

*Wagoner v. Gainer,* 167 W.Va. at 154–55, 279 S.E.2d at 645–46; *see* 6A Am.Jur.2d *Pensions* § 1625. Even the respondent Governor and Commissioner acknowledge that *Wagoner v. Gainer* addressed contract impairment involving public pension programs. For some time other courts have recognized these principles. *See, e.g., Allen v. City of Long Beach,* 45 Cal.2d 128, 131, 287 P.2d 765, 767 (1955); *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467.

We find little merit in the Respondent's argument that this underfunding constitutes merely a technical, rather than a substantial, impairment of the State's contract with public employees and retirants. *See U.S. Trust Co.,* 431 U.S. at 21, 97 S.Ct. at 1517. The respondent Governor and Commissioner argue that, since pension benefits are currently being paid, any impairment of contract is minimal. They cite a Michigan Supreme Court case, *Kosa v. Treasurer of the State of Michigan,* 408 Mich. 356, 292 N.W.2d 452 (1980), as support for their argument that "[a] clear distinction must be drawn between the right

to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits." *Id.* at 371, 292 N.W.2d at 460. This same argument was made to and rejected by the California Court in *Valdes v. Cory*, 139 Cal.App.3d 773, 189 Cal.Rptr. 212 (1983), the Washington Court in *Weaver v. Evans*, 81 Wash.2d 461, 495 P.2d 639, and the Pennsylvania Court in *Dombrowski v. City of Philadelphia*, 431 Pa. 199, 245 A.2d 238 (1968). Those cases found that even where a unilateral reduction in the state's share of pension contributions, as earned by State employees, does not result in out-of-pocket losses for plan participants, they still have a vested interest in the integrity and security of the funds available to pay future benefits. *See, e.g., Valdes*, 139 Cal.App.3d at 785, 189 Cal.Rptr. 222. We agree with this reasoning.

The Legislature has not articulated any public purpose for the underfunding of employer contributions earned by State employees for the PERS trust, and none of the Respondents argue that said underfunding serves to keep the pension system sound and flexible or is offset by comparable new advantages to the participants.

Our State's Legislature is not the first to yield to the temptation of diverting pension funds in hard economic times. As was observed over a decade ago, "[o]n several occasions, governments have failed to continue the actuarial appropriations they had promised to make to the pension system, and courts have uniformly held these missed appropriations to be contract violations." Note, *Public Employee Pensions in Times of Fiscal Distress*, 90 Harv. L.Rev. 992, 1006 (1977); *see, e.g., Valdes v. Cory*, 139 Cal.App.3d 773, 189 Cal.Rptr. 212; *Dombrowski*, 431 Pa. 199, 245 A.2d 238; *see also Weaver v. Evans*, 80 Wash.2d 461, 495 P.2d 639.

### 4. Violation of State Recognized Property Rights

We find in our State Constitution protection for the public pension participants independent from the federal constitution's contract clause. We have already noted our State's Constitution contains its own impairment of contracts clause. W.Va. Const. art. III, § 4. West Virginia's organic law also provides for compensation when private property is taken for public use, W.Va. Const. art. III, § 9, and due process of law when a person is deprived of property rights, W.Va. Const. art. III, § 10. Our analysis of the rights affirmed by each of these state constitutional sections includes consideration of applicable federal constitutional standards, "[u]ltimately, however, we must be guided by our own principles in establishing our State standards, recognizing that so long as we do not fall short of the federal standard our determination is final." *Waite*, 161 W.Va. at 158–59, 241 S.E.2d at 167.

We have firmly established that our State's due process clause, W.Va. Const. art. III, § 10, may, "in certain instances, require higher standards of protection than afforded by the federal constitution". Syl. Pt. 1, *State v. Bonham*, 173 W.Va. 416, 317 S.E.2d 501 (1984) (*quoting* Syl.Pt. 2, *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979). We have also held that inherent in article three, section ten of our Constitution is the concept of substantive due process and that due process protections extend to any significant property interest. *Don S. Co. v. Roach*, 168 W.Va. 605, 285 S.E.2d 491 (1981). We have already reconfirmed today that our Constitution insures that the people will receive the benefit of legislative enactments. Syl.Pt. 1, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781.

■ State law, through the pension statute, establishes contractually based property rights in pension plan participants who have contributed from their wages and have earned the contributions of their employers. *Wagoner v. Gainer*, 167 W.Va. 139, 279 S.E.2d 636; *see Campbell v. Kelly*, 157 W.Va. 453, 202 S.E.2d 369. These rights are recognized and protected under our State's Constitution. W.Va. Const. art. III, §§ 4, 9, 10. Thus, the realization and protection of public employees' pension property rights is a constitutional obligation of the State. The State cannot divest the plan participants of their rights

except by due process, although prospective modifications which do not run afoul of the federal or State impairment clauses are possible.

We understand that the Governor and the Legislature are anxious to avoid difficult choices in raising revenues or cutting expenditures. Nevertheless, the diversion of earned pension trust fund contributions to the State's general revenue fund amounts to little more than an end-run around the constitutional requirement for a balanced budget, W.Va. Const. art. VI, § 51, and deficit financing of state government from earned savings of public employees. The State has a contract with PERS members and retirants, who have earned the employers' contribution due the PERS trust, and it is not proper for the State to unilaterally modify that contract to the detriment of the participants, *see Wagoner v. Gainer*, 167 W.Va. 139, 279 S.E.2d 636, and it is fundamental that any modifications must comport with our State's stringent due process requirements, W.Va. Const. art. III, § 10.

■ The State has promised certain pension rights to public employees as a part of their compensation for services rendered. The PERS has grown with earned contributions of employee and employer alike, held in trust. The amount of employer contributions earned by State employees which have been wrongfully withheld or diverted over the past four years is a public debt, which must be repaid. The payment of statutorily promised pension benefits, on maturity, is a general and moral obligation of the State. We would be faithless to our constitutional duties to allow a raid on the PERS trust for purposes of political expediency, forcing future officials to place a heavy tax burden on posterity to pay for today's profligacy.

As an initial measure, the diversion of retirement funds from special revenue accounts must cease immediately. The Respondent Trustees are hereby mandated to engage an independent actuary to conduct an audit and study to determine pursuant to W.Va.Code, 5–10–31, whether the System has been rendered actuarially unsound

through the underfunding of the past four years. If it is determined that the System is actuarially unsound, then the Respondent Trustees must develop an appropriation plan which will return the System to actuarial soundness. The audit, study, and appropriation plan are to be completed within one hundred eighty (180) days of the issuance of this opinion on rehearing. The amount specified in the appropriation plan to bring the System to actuarial soundness is to be included each year in the Respondent Trustees' certificate to the Governor along with the annual amount required pursuant to W.Va.Code § 5–10–32(a). The extra payment required by the appropriation plan shall not be prorated over more than six budget years beginning with fiscal year 1990–91. The Respondent Governor and Commissioner and their successors are hereby mandated to include the extra appropriation as well as the regular appropriation under W.Va.Code § 5–10–32, in their proposed budget beginning with fiscal year 1990–91.

### III. PAYMENT OF RETIREE'S HEALTH INSURANCE PREMIUMS

Enrolled Senate Bill No. 5, the 1988–89 budget bill, calls upon the Respondent Trustees to make monthly transfers "from employees' contribution moneys, accumulated reserves or investment income" funds sufficient to pay the Public Employees Insurance Agency (PEIA) for the accrued leave program established by West Virginia Code § 5–16–12 (Supp.1987 & 1988 Replacement Vol.). Under this program, retirants receive credit toward extended health insurance coverage in exchange for accumulated sick or annual leave days. *Id.* Apparently, however, no provision was made to fund this program independently and, given the poor financial condition of the PEIA, that agency could not absorb the costs of the accrued leave program. Rather than having the retirants' former employing units pay these costs out of their personnel budgets, the Legislature, using language in a budget bill, instructed the Respondent Trustees to transfer retire-

ment funds sufficient to cover the program's costs. According to the amicus brief, between two and four million dollars was required to fund the program in fiscal year 1987–88.

■ The payment of premiums for the extended health insurance benefits contemplated by Code § 5–16–12 are improper because they violate the retirement statute, because they are contrary to basic trust principles, and because they impair all PERS participants' contracts with the State. Additionally, we have already noted the fundamental impropriety of amending the general law with budgetary language. *Hechler v. McCuskey,* 179 W.Va. 129, 365 S.E.2d 793; *see O'Connor v. Margolin,* 170 W.Va. 762, 296 S.E.2d 892. Thus, the payment of premiums from the PERS trust funds must cease.

The retirement statute provides that "[t]he moneys, investments and all other assets of the retirement system shall be used for the sole purpose of meeting the disbursements for annuities and other payments authorized by this article, and shall be used for no other purpose whatsoever." W.Va.Code § 5–10–40. This statutory provision is explicit, clear, and unambiguous. It is equally clear that the extended insurance benefits in question are neither annuities nor authorized by the retirement act as a pension benefit. The funding scheme contemplated by Senate Bill No. 5 violates the prohibition of Code § 5–10–40, as well as basic principles of trusts and the federal and State constitutions.

■ Moneys earned by public employees and contributed to a public employees' retirement plan, including the employers' contribution which has been earned by the public employees, become part of the corpus of the trust and are not thereafter state funds available for expropriation or use for any purpose other than that for which the moneys were entrusted. *Valdes,* 139 Cal.App.3d at 788, 189 Cal.Rptr. at 224; *see Fortson v. Commissioner,* 98 Pa. Commw. 272, 512 A.2d 734 (1986); *see also Navajo Tribe v. Arizona Department of Administration,* 111 Ariz. 279, 528 P.2d 623 (1974). The funds in the PERS trust

are an equitable estate, property held in common for the benefit of each member and retirant, and dedicated to private ends. The trust funds are not taxpayers' money. The trust funds have been earned by public employees for the benefit of the trust, thus, the funds are not public property. Any expropriation or use by the Legislature of the PERS trust funds for a purpose unrelated to that for which the contributions were earned and made is an adverse modification of vested rights of the PERS participants, for the reasons explained in part II C 3 of this opinion. *See Valdes,* 139 Cal.App.3d 773, 189 Cal.Rptr. 212; *Sgaglione v. Levitt,* 37 N.Y.2d 507, 337 N.E.2d 592, 375 N.Y.S.2d 79 (1975). The amounts expropriated from the retirement trust funds for purposes other than those for which the funds were collected constitute a public debt owed by the State to the trust funds, and such expropriation must be remedied by recompense through appropriation. This result is compelled by the West Virginia Constitution, in article III, section 9.

It makes no difference that future retirants will benefit from the expenditure by having health insurance paid; this is not the purpose for which the funds were earned and contributed. *See Giessel,* 12 Wis.2d 5, 106 N.W.2d 301. As previously noted, public employees are mandated to participate in the PERS program, the benefits they receive are earned and are a form of deferred compensation, and the terms of the PERS trust are spelled out by statute, which forms a constitutionally protected contract. The essence of that contract is that upon retirement, an annuity will be paid equal to two percent of the retirants final average salary for his three highest years salary multiplied by the number of years service with which he has been credited. W.Va.Code § 5–10–22. This base contract, of course, may be modified by various elective options providing for deferred retirement and survivor's benefits.

■ The extended health insurance premiums are improper, and they are but an example; any payout from the PERS trust can only be made for purposes defined at

the time the money was earned and contributed and in the amounts and under the conditions stated at the time the public employee was a member of the program. Members, retirants, and other beneficiaries are only entitled to participate in the retirement system as defined by the statutory contract. If the Legislature modifies the contract so as to result in new or additional benefits, whether out of gratitude, compassion, or any other motivation, it must provide additional funding to pay for those benefits. *See In re State Employee's Pension Plan,* 364 A.2d 1228.

We have already noted that the respondent Treasurer and Auditor do not object to this Court halting the payments to PEIA. The Governor and the Commissioner argue that the payments to the PEIA are acceptable under a contracts analysis because they were necessary to buy valuable time to solve the State's health insurance crisis, an important public purpose.[15] This plea of necessity fails, because the PERS funds are not state moneys available for appropriation. It may also be noted that the argument fails because the payments do not meet the five point test advocated by the Respondents and articulated in *Allied Structural Steel,* 438 U.S. at 242, 98 S.Ct. at 2721. The Legislature did not declare an emergency need for the transfers, and, although a basic societal interest is protected, it is for a favored group. We have no way of knowing if the transfers are the most narrowly tailored solution to the health insurance problem or if the transfers are for a limited duration. Certainly the transfers are not "reasonable" vis-a-vis the PERS, as they do not serve to keep the system sound and flexible. *See Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636.

---

**15.** The other Respondents do not address the issue of PEIA payments.

**16.** Article six, chapter twelve of the Code transferred the investment duties for the PERS funds to the Respondent State Board of Investments. W.Va.Code §§ 12-6-2(6), 12-6-8(a), 12-6-13. We agree with the Supreme Court of Kansas that an administrative change, such as the transfer of investment responsibility, is not a vital

## IV. INVESTMENT OF FUNDS

The Petitioner's final major concern is that the moneys from the various PERS funds have been invested improperly, placing the system's reserves at risk. When the PERS was initially formed, the Board of Public Works was charged with investing the System's funds[16] "in any securities or investments in which the sinking funds of the state may be legally invested, or in any securities in which the deposits in savings banks" may be invested. W.Va. Code § 5-10-38.

Code § 5-10-38 is one of the terms of the contract between the State and the PERS participants. The State is severely limited in its power to unilaterally modify this term of the pension contract to the detriment of the PERS participants. *See Allied Structural Steel,* 438 U.S. 234, 98 S.Ct. at 2717; *Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636. But beyond the contractual limitations, the Respondent Board of Investments has the highest fiduciary duty to see to it that the PERS funds are placed in secure, not speculative, investments. The Respondent Board of Investments is charged by statute with investing "[a]ll moneys of the retirement system not currently required for the payment of annuities or other benefits." W.Va. Code § 5-10-38. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874 comment a (1977). Thus, the Board of Investments has a fiduciary relation with the PERS trust and participants and must invest employee earned pension systems assets consistently with the highest standards of fiduciary duty. It must utilize competent, educated, and trained financial managers

part of the state's contract with PERS participants, but is more akin to a reorganization or housekeeping change. *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467. This modification is reasonable and we see no reason why it should not serve to keep the system sound and flexible. *See Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636.

to seek and manage high quality investments and to avoid speculative commercial and industrial ventures and schemes.

Guidance for proper pension fund investments may be drawn from Code § 5–10–38, which from the 1961 passage of the pension act has authorized that pension moneys may be invested as are the sinking funds of the State or as are the deposits of saving banks. Because of the fluidity and erosion of the regulation of banking practice, the savings bank standard is no longer a meaningful one by which to measure compliance with fiduciary duties, and we are left with the standards for the State's sinking fund,[17] which apparently remain consistent with the highest standards of fiduciary duty. W.Va.Code § 13–3–7 (1985 Replacement Vol.).

The Respondents are mandated to remove pension funds from speculative to secure investments and to make future investments of the PERS funds consistently with the highest standards of fiduciary duty. The necessary accounting adjustments should be made immediately so that any current speculative or improper investments are transferred from the PERS investment pool[18] to another pool.

## V. OTHER MATTERS

The Petitioner has expressed some concern that, given the financial problems of the PERS, a pro rata reduction in his annuity may be imminent. Code § 5–10–43 provides, in relevant part, that

> if at the end of any fiscal year the total of the annuities paid from the retirement reserve fund during the said fiscal year is more than ten percent of the sum of the balances in the employers accumulation fund and the retirement reserve fund at the end of the said fiscal year, the said annuities payable in the next ensuing fiscal year shall be reduced, pro rata....

The above cited provision was included in the statute as originally adopted in 1961 and continues in effect today. Because it makes up part of the terms of the pension contract, reduction in annuity payments according to the statutory terms would not, on its face, run afoul of the federal contracts clause.

We do not choose, however, to interpret the statutory provision involved on the basis of the information before us,[19] or to address the due process implications of a pro rata reduction. There has been no showing that a pro rata reduction of annuities is being contemplated by the Respondent Trustees. The Petition does not ask us to order such a reduction. Instead, it is appropriate for the Respondent Trustees to have the independent actuarial evaluation conducted pursuant to part II of this opinion also determine if the statutory provision for a pro rata reduction should be applied. Any necessary legal action may be brought to this Court by the affected parties at that time.

To summarize our holdings today, the Trustees will retain an independent actuary, to conduct an audit and study to determine, within 180 days, the amount of general and special revenue fund appropriations necessary to recompense for past underfunding, to develop a plan for such recompensation, and to determine if the relevant PERS account balances are such as to precipitate the statutory pro rata reduction in annuity payments.

The Governor and the Commissioner are mandated to include in the appropriation plan for fiscal year 1990–91 the full amount of employers' contributions earned by State employees certified pursuant to W.Va.Code § 5–10–32(a), and also any additional funds as may be necessary as determined by the Respondent Trustees' appropriation plan. The Senate President and the Speaker of

---

**17.** The West Virginia municipal bond commission is the successor to the state sinking fund commission.

**18.** The 1987 Annual Report of the Board of Investments designates this portfolio as Pool 7635.

**19.** The facts before us on this issue are sketchy and the issue has not been fully briefed by all parties. *See State ex rel Alsop v. McCartney,* 159 W.Va. 829, 228 S.E.2d 278 (1976).

the House must introduce in their respective houses proposed budget bills which meet these requirements.

The PERS Board of Trustees is instructed to cease and desist from execution of improper and illegal legislation expiring funds appropriated to the PERS and from the transfer of special revenue funds to the general fund,[20] to take all steps necessary to insure that earned and appropriated funds are drawn down quarterly as required by statute and deposited to the proper retirement fund accounts. The Commissioner, Treasurer and Auditor have a duty to facilitate this payment process.

The Trustees and the Board of Investments are required to invest the System's funds in compliance with the highest standards of fiduciary duty, and the Board of Investments must make immediate necessary accounting adjustments to rectify past investments not consistent with those standards.

Writs as Moulded Granted.

---

**20.** As we understand the process, the PERS Trustees have been regularly receiving special revenue funds earmarked as employer contributions. If this is not the case, they are instructed to obtain and retain such funds for the benefit of the trust.