Brereton C. JONES, Governor,
et al., Appellants,

v.

BOARD OF TRUSTEES OF KENTUCKY
RETIREMENT SYSTEMS, et al.,
Appellees.

Nos. 94–SC–487–TG;  94–SC–493–
TG;  and 94–SC–840–TG.

Supreme Court of Kentucky.

Nov. 22, 1995.

loy, II, Secretary of Finance Administration Cabinet.

H. John Schaaf, Nancy R. Osborne, Legislative Research Commission, Frankfort, for Appellants, Jody Richards, John A. "Eck" Rose, and The Members of the Legislative Research Commission.

William E. Johnson, Squire N. Williams, Jr., Stephen R. Turnbull, Johnson, Judy, True & Guarnieri, L.L.P., Frankfort, William P. Hanes, David T. Miller, Frankfort, for Appellees, Kentucky Retirement Systems.

C. David Emerson, Emerson & Bayer, Lexington, for Amicus Curiae, Kentucky Association of State Employees.

Gary W. Napier, Reece & Lang, P.S.C., Lexington, Thomas Alan Marshall, Frankfort, Samuel L. Perkins, Lexington, for Amicus Curiae, 10 To 40 Club.

Gary W. Napier, Reece & Lang, P.S.C., Lexington, Michael E. Gurley, Hamilton and Faatz, Denver, CO, for Amici Curiae, Public Employees' Retirement Association of Colorado and Utah State Retirement Office.

John D. Adkisson, Drew Liebert, Nossman, Guthner, Knox & Elliott, Sacramento, CA, Richard H. Koppes, General Counsel, Kayla J. Gillian, Asst. General Counsel, Board of Administration, California Public Employees' Retirement System, Sacramento, CA, Lawrence P. Boulger, Chief Counsel, State Teachers' Retirement System, Sacramento, CA, for Amici Curiae, California Public Employees' Retirement System and The California State Teachers' Retirement System.

LAMBERT, Justice.

The Kentucky Employees Retirement System (KERS) was created by statute in 1956 to provide a secure means of retirement savings for state government employees. KERS is one of several retirement systems, which include county employees, state employees, and state police, governed by the Board of Trustees (Board). Five trustees are elected by KERS members, three are appointed by the Governor, and the Commissioner of Personnel occupies the final position. KRS 61.645(1). The Board oversees

Frank F. Chuppe, Virginia H. Snell, Beverly J. Glascock, Wyatt, Tarrant & Combs, Louisville, for Appellants, Brereton C. Jones, Governor, Kevin J. Hable, Secretary, Claude M. Vaughn, State Budget Director, Frances Jones Mills, Treasurer, and W. Patrick Mul-

the system in a fiduciary capacity, and administers the plan "solely in the interest of the members and beneficiaries...." KRS 61.650(1).

In 1972, the General Assembly enacted KRS 61.692 which provides:

It is hereby declared that in consideration of the contributions by the members and in further consideration of benefits received by the state from the member's employment, KRS 61.510 to 61.705 shall, except as provided in KRS 6.696, constitute an inviolable contract of the Commonwealth, and the benefits therein shall, except as provided in KRS 6.696, not be subject to reduction or impairment by alteration, amendment, or repeal.

KERS membership is mandatory for all full time public employees who are not members of another retirement system. Regular employee members are required to contribute 5% of their wages. Hazardous duty workers and state police officers must contribute 7% of their wages into the system. The state, pursuant to KRS 61.565, must contribute to the system. The amount of the state contribution and whether it may be mandated by the Board is at issue in this litigation.

In September 1991, the Board of Trustees' actuary determined that the state contribution to the system should be increased because of losses in investment return, salary increases, and expected increases in medical premium rates. The actuary recommended that the state rate of contribution to the plan, beginning July 1, 1992, be set as follows: for KERS nonhazardous, 8.66%, up from 7.65%; for KERS hazardous, 17.55%, up from 15.5%; and for SPRS, 21.84%, up from 19.57%. The Board adopted the proposed increases and included them in its budget request.

The Governor declined to follow the Board's recommendations. He submitted a state rate of contribution the same as that of the previous year. In the process of so doing, the Governor concluded that valuation of KERS assets should be modified to reflect market value, not book value as was being used by the Board. It was suggested that market value better reflected the financial condition of KERS. No actuarial assistance

was used in reaching this conclusion. Utilization of the market value of assets is required in pension funding for Employee Retirement Income Security Act (ERISA) qualified plans, and it is typical of the valuation method used in most public plans.

After the General Assembly enacted the 1992 Budget Bill, the Board, on advice of its actuary, adopted the modified market system of asset valuation. The actuary noted, however, that state contribution rates should be re-examined due to uncertainty with regard to medical funding expense and health insurance benefits when viewed under the new valuation method. In passing, we observe that the legislative and judicial retirement plans of Kentucky use book valuation of assets.

The Board filed a Petition for Declaration of Rights, pursuant to KRS 418. It claimed that the 1992 Budget Bill usurped the authority of the Board to act independently to set actuarially sound employer contribution rates. The Board asserted that failure to meet its contribution requests impaired KERS member contract rights under KRS 61.692. It claimed the protection of Section 19 of the Kentucky Constitution, and of Article I, Section 10, and the Fifth and Fourteenth Amendments to the United States Constitution.

On April 22, 1992, the Franklin Circuit Court granted summary judgment in favor of the Board, holding Part III, Subsection 16 of the Budget Bill void as an unlawful impairment of KERS members' inviolable contract rights, including all statutory rights specifically referenced in KRS 61.692. The court ordered appellants to "take such steps as are necessary to cause employer agencies immediately to pay over to the Kentucky Retirement Systems all past due employer contributions plus interest ... based upon the rates established by the Board rather than the rate set out in the budget bill." Effectively, the judgment of the trial court granted unrestricted power to the Board to say what sum it should receive as payments from the Commonwealth. Of course, we assume the trial court included an implied condition that the Board not act arbitrarily.

■ While we recognize that the retirement savings system has created an inviolable contract between KERS members and the Commonwealth, and acknowledge that the General Assembly can take no action to reduce the benefits promised to participants, we must nevertheless reverse the trial court. Contrary to the approach it took, the focus of the litigation should be upon what, if any, substantive contractual infringement occurred by virtue of the actions of the Governor and General Assembly in rejecting the recommendations of the Board. We conclude that since there was no showing that any benefit commitment made to KERS members was infringed, or threatened, the Board had no power to mandate rates of contribution and require their adoption.

■ Prior to reaching the issues which are decisive, it is necessary to address appellants' procedural claims. As a first matter, we hold that the named appellants do not have immunity in this action. In *Rose v. Council for Better Education, Inc.,* Ky., 790 S.W.2d 186 (1989), we held that the General Assembly was properly brought before the Court in a declaratory judgment action addressing the General Assembly's constitutional obligations regarding an efficient system of common schools. In *Rose,* the Speaker of the House and President of the Senate were named as defendants in the action and we held that although they could not by themselves enact legislation, they could "defend the constitutionality of an act or acts," and it was "only common sense and practical to hold that service [of process] on both President *Pro Tempore* of the Senate and the Speaker of the House of Representatives named in their respective capacities is sufficient to acquire jurisdiction over the General Assembly in this action." *Id.* at 204–05.

Similarly, in *Philpot v. Patton,* Ky., 837 S.W.2d 491 (1992), we rejected immunity in a declaratory judgment action "to decide whether the General Assembly has failed to carry out a constitutional mandate and that members of the General Assembly are not immune from declaratory relief of this nature simply because they are acting in their official capacity." *Id.* at 493–94 (citing *Rose v. Council for Better Educ., Inc.,* Ky., 790

S.W.2d 186 (1989)); *see also Kraus v. Kentucky State Senate,* Ky., 872 S.W.2d 433, 439 (1994) (holding that "members of the General Assembly are not immune from declaratory judgment relief simply because they are acting in their official capacities"). It would undermine and destroy the principle of judicial review to hold that the General Assembly could act with immunity, contrary to the Kentucky Constitution. Any such holding would leave citizens of this Commonwealth with no redress for the unconstitutional exercise of legislative power. This we will not do. *Fischer v. State Bd. of Elections,* Ky., 879 S.W.2d 475 (1994). There is no immunity here.

The crucial issue before us is whether the General Assembly must blindly defer to the Board in matters of state retirement funding. We have acknowledged that KERS members have a contractual right to the benefits they were promised upon retirement. Any reduction or demonstrable threat to those promised benefits might well run afoul of Section 19 of the Kentucky Constitution, but we can leave that issue for another day. In the present case there has been only a refusal by the executive and legislative branches of government to adhere to the Board's suggested funding rates. There has been no showing that the retirement benefits promised to KERS members have been or will be infringed by the failure to adopt the Board's recommendations.

■ While the Board's necessary function is the management of the KERS, such does not encompass an unrestricted right to demand funding from the General Assembly. To achieve its determination that contribution rates should remain constant from the previous year, the General Assembly temporarily suspended KRS 61.565 which allows the Board to set the contribution rate. This suspension was necessary to permit the General Assembly to maintain funding at the 1991 levels. While appellees assert that the suspension of the statute was a constitutional violation in that the statute suspended is a contractual right, such is without merit. The contract between the Commonwealth and its employees is for retirement funding. It is not a contract which denies the General As-

sembly the ability to fashion its ways or means in providing the pension funds. The appellees' argument that the retirement statutes forever removed legislative power to amend those statutes runs afoul of our holding in *Legislative Research Commission v. Brown*, Ky., 664 S.W.2d 907 (1984). If KRS 61.565 was intended as an abdication of legislative power, then such would have been an unlawful delegation. *Id.* at 929. We need not reach that question, however, as it is necessary to state only that appellees have failed to show any impairment in retirement funding by the actions of the Governor and General Assembly.

■ We have held that adoption of a budget is a legislative matter. *Legislative Research Comm'n v. Brown*, Ky., 664 S.W.2d 907, 925 (1984). Furthermore, the duty to oversee the budget process requires an overview of all budgetary expenditures, and the power to adjust non-mandatory funding to balance the budget.

■ Inasmuch as the General Assembly may set rates of contribution that differ from those recommended by the Board, it also possesses the power to suspend current statutes to accomplish the task. At the time the General Assembly decided that funding rates should remain constant from the previous year, there was a budget shortfall. It was the duty of the General Assembly to take steps to ensure the continued operation of government without excessive generosity to one governmental entity at the expense of others. We have held that "[i]f revenues become inadequate, the General Assembly must be empowered to use adequate devices to balance the budget. Provisions in the budget document which effectively suspend and modify existing statutes which carry financial implication certainly are consistent with those duties and responsibilities." *Commonwealth ex rel. Armstrong v. Collins*, Ky., 709 S.W.2d 437, 443 (1986).

■ While the Board held to the book valuation method to determine asset value and required funding, both the General Assembly and the governor adopted the modified market value approach. The Board later adopted the market valuation approach for future funding requests, but held to its previous requests due to an increased projected cost for medical expense funding. The change to market valuation netted an increase of $230 million in the value of KERS assets as of June 30, 1991, an increase that reached $322 million by June 30, 1993. If the market value had been used in determining contribution rates, those rates would have been substantially the same as, or less than, the rates approved by the General Assembly. Instead, upon re-examining its suggested contribution rates under the modified market value method, the Board's actuary justified maintaining his proposed rates because of a suggested improper initial projection in future medical insurance costs as effected by the change in valuation methods.

Although adoption of the modified market valuation method was a substantial change for KERS, its own actuary described the change as reasonable, and adopted the method for 1992 and future valuations. This method is the same as is used by the Kentucky Teacher's Retirement System. As to the claimed under funding of potential medical expenses, there has been no showing that benefits promised to KERS members will be infringed by the funding rates set by the General Assembly. The Board's actuary contended that medical insurance funding must be re-examined with regard to modified market valuation. He later admitted, however, that his projected inflation rate for medical expenses of 10% was excessive, and that a rate of 6% was more appropriate in the future.

What is clear upon the actuary's recommendation is that the medical insurance portion of KERS benefits was in no danger from the rates set by the General Assembly. In 1992, Kentucky was one of only six states which attempted to pre-fund medical insurance obligations, with most states choosing instead a "pay as you go" method which avoids guesswork in predicting future rates of inflation for medical expenses. The KERS request for insurance pre-funding was not ignored, as the General Assembly set what may be characterized as a conservative rate in its attempt to meet the KERS desire

to pre-fund the obligations while also maintaining prudent control of tax expenditures.

■ Cases from other jurisdictions which are cited by appellees are easily distinguishable. *See, e.g., United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1938); *Maryland State Teachers Ass'n v. Hughes,* 594 F.Supp. 1353 (D.Md.1984); *Valdes v. Cory,* 139 Cal.App.3d 773, 189 Cal. Rptr. 212 (1983); *State ex rel. Dadisman v. Caperton,* 186 W.Va. 627, 413 S.E.2d 684 (1991); *Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816 (1988). Many of those cases involved cuts in pension funding which resulted in endangerment of current and future pension benefits, thus resulting in a substantial impairment of the contractual pension rights of employees. What is clear in the present case is that appellees have failed to show any infringement on those rights, contending only that the Board should have total independence to set the rates. The pension rights of appellees are of substance, not rights predicated on inconsequential practice or the configuration of words. At the simplest level, appellees have the right to the pension benefits they were promised as a result of their employment, at the level promised by the Commonwealth. This right does not include oversight of every aspect of the process; its essence is the receipt of promised funds.

In *Valdes v. Cory,* 139 Cal.App.3d 773, 189 Cal.Rptr. 212 (1983), the California Legislature enacted "fiscal-emergency legislation" which suspended the state contribution to the employee pension fund for a period of three months. In addition, the legislation ordered that the amount of the shortfall be covered by taking money from the reserve against deficiencies portion of the retirement fund.

The California Court of Appeals held that such action impaired the contractual obligations that California had to its state workers and that the act violated constitutional prohibitions against impairment of contracts. *Valdes,* 189 Cal.Rptr. at 223. The court held that the legislation might infringe the employees' interests "in the security and integrity of the funds available to pay future benefits." *Valdes,* 189 Cal.Rptr. at 222.

While appellees wish to characterize the Kentucky General Assembly's actions as those in *Valdes,* we are unpersuaded. In *Valdes,* a complete suspension of employer contributions occurred, and there was a raid on the reserve account to pay for the state's contribution. This is a far cry from the present case in which the 1992 Budget Bill merely maintained the rate of contribution as that of the previous year. After a change in the valuation method from book value to modified market value, and without regard to the Board's admittedly excessive estimate of future medical expenses, actuaries determined that the rate of contribution under the new method should be lower than the rate submitted by the Board.[1] The 1992 Budget Bill did not impair the contractual rights of KERS members.

In *Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816 (1988), West Virginia state statutes required the Governor to include in his budget the actuarially determined rates of contribution submitted by the retirement system trustees. *Id.,* 384 S.E.2d at 823. Although the Governor countermanded the statute by including a lesser amount, the Legislature suspended state pension contributions and redirected those funds to the general fund for a period of four years. *Id.* The West Virginia Supreme Court held that such actions violated both the requirements of the statutes, and substantially impaired the contractual pension rights of state em-

---

1. Sheryl R. Wingert, Vice President and Actuary of The Segal Company, found that "[i]f the Board's actuary had used the modified market value of assets in the 1990 and 1991 actuarial valuations, the calculated employer contribution rates would have decreased because the modified market value of assets was greater than the book value." Wingert Aff. at 3.

Ken Hohman, consulting actuary and managing partner of the Louisville office of Bryan, Pendleton, Swats & McAllister, found that "if the Board's actuary had used the modified market value method of valuing KERS' assets (that he adopted in the following year), and kept all other assumptions the same," the 1992 rates would have been substantially less than those submitted by the Board, and practically the same as the 1991 rates maintained by the Governor and General Assembly for the 1992 Budget Bill. Hohman Aff. at 3–4.

ployees. *Id.* at 826. Later, in *State ex rel. Dadisman v. Caperton,* 186 W.Va. 627, 413 S.E.2d 684 (1991), the employees sought a writ of mandamus to force the Legislature to repay to the pension an amount sufficient to recover for the previous underfunding. *Id.,* 413 S.E.2d at 686. The court refused, however, and held that such payment was not required as there was no showing that the pension fund was "actuarially unsound" such as to require repayment for past underfunding. *Id.* at 689. In the present case, the actions of the Governor and the General Assembly in maintaining the previous rate of the state contribution did not violate Kentucky statutes, nor impair pension rights so as to violate Section 19 of the Kentucky Constitution.

Only upon a determination that the contract between KERS members and the state is substantially impaired by legislative action do we need to decide whether the legislation impairing the contract is reasonable and necessary to serve a legitimate and important public purpose, necessitating a temporary impairment. *See Maryland State Teachers Ass'n v. Hughes,* 594 F.Supp. 1353, 1361 (D.Md.1984). As appellees have shown no substantial impairment in their contractual rights by the actions of the General Assembly, we need not decide under what circumstances the state's contract with its workers could be lawfully impaired.

Appellants were within their discretion to modify the funding requests submitted by the Board. The 1992 Budget Bill constituted a proper exercise of legislative authority. We reverse the judgment of the Franklin Circuit Court and remand for entry of judgment in conformity herewith.

FUQUA, LEIBSON, STUMBO and WINTERSHEIMER, JJ., concur.

REYNOLDS, J., concurs in result only.

STEPHENS, C.J., not sitting.