Dear Representative Pettigrew,
¶ 0 This office has received your letter asking for an official Opinion addressing, in effect, the following questions:
1. Is the State of Oklahoma currently responsible for theunfunded actuarial accrued liability of the State's six definedbenefit retirement systems?
2. What is the obligation of the State of Oklahoma to annuallyand ultimately fund the promised retirement benefits of theState's public retirement systems to vested members?
3. Upon financial default of one of the State of Oklahoma'sstatewide public retirement systems, would the State of Oklahomabe legally responsible to fund the insolvent System?
4. Is the State of Oklahoma legally responsible for that portionof unfunded actuarial accrued liability which existed at the timethe State assumed control of the Oklahoma Police Pension andRetirement System and the Oklahoma Firefighters Pension andRetirement System?
¶ 1 Your questions, while addressing four separate and distinct issues, essentially concern the same subject matter — the very complex nature of the State of Oklahoma's present and future liability to current and retired public employees with respect to the funding and financial maintenance of its six statewide statutory public pension systems: Oklahoma Firefighters Pension and Retirement System ("Firefighters"), 11 O.S. 1991, §§49-100.1[11-49-100.1] et seq., and 11 O.S.Supp. 1996, §§ 49-100.1[11-49-100.1] et seq.; Oklahoma Police Pension and Retirement System ("Police"), 11 O.S. 1991, §§ 50-101[11-50-101]et seq., and 11 O.S.Supp. 1996, §§ 50-101[11-50-101] et seq.; Uniform Retirement System for Justices and Judges ("Judges"),20 O.S. 1991, §§ 1101[20-1101] et seq., and 20O.S.Supp. 1996, §§ 1101[20-1101] et seq.; Oklahoma Law Enforcement Retirement System ("OLERS"), 47 O.S. 1991, §§ 2-300[47-2-300] et seq.,
and Supp. 1996, §§ 2-300 et seq.; Oklahoma Teachers' Retirement System ("OTRS"), 70 O.S. 1991, §§ 17-101[70-17-101] et seq., and 70O.S.Supp. 1996, §§ 17-101[70-17-101] et seq.; and the Oklahoma Public Employees Retirement System ("OPERS"), 74 O.S. 1991, §§ 901[74-901] etseq., and 74 O.S.Supp. 1996, §§ 901[74-901] et seq.
¶ 2 In order to respond to your inquiries, it will be necessary to examine the statutory, constitutional and common law in Oklahoma as well as the applicable law from other jurisdictions to determine the State's legal responsibility for the funding of existing public pensions and payment of retirement benefits.
 I. STATE'S RESPONSIBILITY FOR UNFUNDED ACTUARIAL ACCRUED LIABILITY OF STATE RETIREMENT SYSTEMS
A. Unfunded Actuarial Accrued Liability Explained
¶ 3 In your first question, you ask this office to determine whether the State of Oklahoma is currently liable for the unfunded actuarial accrued liability ("UAAL") of the State's six defined benefit retirement systems. For purposes of this opinion, it will be assumed as fact that the State's public retirement systems all possess some degree of UAAL. Before attempting to respond to your first question, it is necessary to explain the actuarial funding methodology of defined benefit plans and define UAAL in the context of the State's public pensions.
¶ 4 As indicated in your question, the six statewide retirement systems previously referenced are known as "defined benefit plans". As noted in A.G. Opin. No. 95-45, a defined benefit plan is one that promises to pay a specified amount to each member who retires after a set number of years of service. Pulliam v.Pulliam, 796 P.2d 623, 624 (Okla. 1990). Under the Oklahoma plans, the specific retirement benefit is calculated as a percentage of the final average salary multiplied by years of service. The defined benefit plans in Oklahoma are generally funded, in part, by obligatory deductions from a member/employee's salary, mandatory employer contributions, dedicated tax revenues and direct legislative appropriations. The statutory retirement benefit amount is paid without regard to the plan's investment performance, but instead is based upon the formulaic specifications in the retirement plan's statutory provisions.
¶ 5 While the retirement benefit itself is definitely determinable in a defined benefit plan, generally the costs offuture benefits are based upon actuarial estimates of factors including, but not limited to, future salary increases, investment yields, mortality and employee turnover. See, DefinedBenefit Plan Funding: How Much is Too Much? Regina T. Jefferson,44 Case W. Res. L. Rev. 2-3. In fact, it is universally accepted that the funding of every pension plan is based upon certain actuarial assumptions. See, Employees' Rights toEmployer Contributed Pension Benefits After a Plant Shutdown,Nanci S. Snow, 1984 Utah L. Rev. 808. The use of actuarial estimates in conjunction with funding methods enables an employer to systematically allocate plan costs over the life of the plan in order to avoid large plan costs in relative short periods as plan obligations become due. See Regina T. Jefferson, DefinedBenefit Plan Funding: How Much is Too Much? 44 Case W. Res. L. Rev. 2-3.
¶ 6 Under an actuarial cost methodology, "normal cost" is that portion of the actuarial present value of pension plan benefits and expenses which is allocated to a valuation year. Glossary of Actuarial Terms, (Editorial Advisory Committee of the Actuarial Standards Board, September 1994). If "normal costs" are funded each year from a participant's date of hire, and all actuarial assumptions prove to be correct in a system free from future amendments, the contributions needed to fund the "normal cost" will be sufficient to fund the plan for all participants. See
Sharon A. Peake, The Basics of Pension Funding in IFE Trustee Handbook 31 (Institute for Fiduciary Education n.d.).
¶ 7 However, actual experience invariably differs from initial actuarial assumptions in most defined benefit plans and the "normal cost" does not cover the present actuarial value of benefits needed. Unfunded or underfunded plan amendments, changes in investment yields and mortality rates, experience losses, salary increases and employee turnover are all factors which may necessitate changes in a plan's actuarial assumptions. Because of these changes, the present value of benefits often cannot be funded by "normal costs" alone. See Sharon A. Peake, TheBasics of Pension Funding in IFE Trustee Handbook 31 (Institute for Fiduciary Education n.d.). That portion of the present value of pension benefits and expenses that is not provided for by "normal costs" is called the "actuarial accrued liability." See
Glossary of Actuarial Terms, (Editorial Advisory Committee of the Actuarial Standards Board, September 1994). Any excess ofactuarial accrued liability over the actuarial value of plan'sassets is considered UAAL.[1] See Glossary of Actuarial Terms, (Editorial Advisory Committee of the Actuarial Standards Board, September 1994). Or stated another way, UAAL is the liability for future benefits which is in excess of (i) the actuarial value of assets, and (ii) the present value of future normal costs.
¶ 8 In Oklahoma, the State can generally reduce its public plans' normal costs and UAAL through the direct appropriations, dedicated revenue, employer contributions, and public employee contributions previously referenced. The UAAL is usually funded or amortized over many years in installments.[2] See
Sharon A. Peake, The Basics of Pension Funding in IFE Trustee Handbook 32 (Institute for Fiduciary Education n.d.). Notably, in the private sector, pension plans are subject to minimum UAAL funding requirements under the Employee Retirement Security Act of 1974 ("ERISA"). See, 29 U.S.C. § 1001 et seq.[3] The same does not generally hold true for public pension plans. Historically, states have not been legally obligated to currently fund a public retirement plan's UAAL unless specifically required by constitution or statute. See Regina T. Jefferson, DefinedBenefit Plan Funding: How Much is Too Much? 44 Case W. Res. L. Rev., 38, n. 21 (Fall 1993).
B. Oklahoma Funding Statutes
¶ 9 In Oklahoma, the statutory provisions of all six of the statewide public plans expressly and impliedly require current actuarial funding based upon annual, fiscal year determinations. See, 11 O.S. 1991, §§ 49-100.8[11-49-100.8], 49-119 (Firefighters); 11 O.S.1991, § 50-105.3[11-50-105.3], 50-109 (Police); 20 O.S. Supp. 1996, §1108[20-1108](A) (Judges);[4] 47 O.S. 1991, § 2-308.2[47-2-308.2](3) (OLERS); 70 O.S. Supp. 1996, § 17-106[70-17-106](21) (OTRS); and74 O.S. Supp. 1996, § 920[74-920](5) and (6)(OPERS). For example, under the Firefighters and Police Systems' statutes, the Legislature requires the following:
 The State Board shall certify to the Director of State Finance, the Speaker of the House of Representatives, and the President Pro Tempore of the Senate, on or before July 15 of each year, an actuarially determined estimate of the rate of contribution which will be required, together with all accumulated contributions and other assets of the System to pay by level-dollar payments all liabilities which shall exist or accrue pursuant to the provisions of the System, including amortization of the unfunded accrued liability over a period of not to exceed thirty (30) years beginning July 1, 1988.
. . . .
 In addition, the State of Oklahoma shall make such appropriation as is necessary to assure the retirement benefits provided by this article.
11 O.S. 1991, §§ 49-100.8[11-49-100.8], 49-119 (Firefighters); 11 O.S.1991, §§ 50-105.3[11-50-105.3], 50-109 (Police) (emphasis added).
¶ 10 Similarly, applicable provisions in the OPERS' statutes require in pertinent part:
 (5) The Board shall certify, on or before July 15 of each year, to the Office of State Finance in the case of the state . . . an actuarially determined estimate of the rate of contribution which will be required, together with all accumulated contributions and other assets of the System, to be paid by each such participating employer to pay all liabilities which shall exist or accrue under the System, including amortization of the past service cost over a period of not to exceed forty (40) years from June 30, 1987, and the cost of administration of the System, as determined by the Board, upon recommendation of the actuary.
 (6) The Office of State Finance and the Governor shall include in the budget and in the budget request for appropriations the sum required to satisfy the state's obligation under this section as certified by the Board and shall present the same to the Legislature for allowance and appropriation.
74 O.S.Supp. 1996, § 920[74-920](5) and (6) (emphasis added).
¶ 11 Thus, in Oklahoma, the Legislature has statutorily mandated that the State's public retirement systems be actuarially funded each year, including the long-term funding of unfunded accrued liability. It can be further concluded that, in order to meet the financial obligations imposed by its actuarial funding mandates, the Legislature has currently obligated the State of Oklahoma and its political subdivisions to annually fund the six statewide retirement systems either through direct appropriations, dedicated tax revenues or state employer contributions. See, e.g., 36 O.S. 1991, § 312.1[36-312.1](A)(1) (Dedicated Premium Tax Revenue — Firefighters); 11 O.S. 1991, §49-119[11-49-119] (Direct Appropriations as necessary — Firefighters); 36O.S. 1991, § 312.1[36-312.1](A)(2) (Dedicated Premium Tax Revenue — Police); 11 O.S. 1991, § 50-109[11-50-109] (Direct Appropriations as necessary — Police); 36 O.S. 1991, § 312.1[36-312.1](A)(3) (Dedicated Premium Tax Revenue — OLERS); 47 O.S. 1991, § 858[47-858](1) (Inspection Fee Revenue — OLERS); 47 O.S. 1991, § 2-304[47-2-304](A) (State Employer Contributions — OLERS); 20 O.S.Supp. 1996, §1308[20-1308] (Dedicated Court Fund Revenue — Judges); 74 O.S.Supp.1996, § 920[74-920](6) (State Employer Contributions, must be included in budget by Governor — OPERS); 68 O.S.Supp. 1996, § 1004[68-1004](2) (Dedicated Gross Production Tax Revenue — OTRS); and 70O.S.Supp. 1996, § 17-108[70-17-108] (State Employer Contributions — OTRS).
¶ 12 Therefore, in partial response to your first question, it is concluded that the Legislature has statutorily obligated the State of Oklahoma to actuarially maintain the funding of its public retirement plans at the present time. However, express statutory requirements are not always the exclusive source of mandated actuarial funding for public retirement systems. In certain circumstances, courts are also empowered to require a state legislature to properly fund the states' public pension plans, including the UAAL, under constitutional mandates.
C. Attorney General Opinion 81-53 — Prior Examination ofUnfunded Liability Under Fiscal Provisions of OklahomaConstitution
¶ 13 In Attorney General Opinion 81-53, this office addressed questions of whether an increase in the "unfunded past service liability" of the Oklahoma Public Employees Retirement System, the Oklahoma Teacher's Retirement System and other public retirement systems financed by the State of Oklahoma constituted an "ordinary expense" of the State subject to Article X, §§ 2 and3 of the Oklahoma Constitution or State "debt" within the meaning of Article X, §§ 4 and 23-26.
¶ 14 Similar to your first question, the central issues in A.G. Opin. 81-53 were whether, under the above-cited fiscalprovisions of the Oklahoma Constitution, the Legislature was required to annually fund the unfunded past service liability of the State's public retirement plans and whether each plan's unfunded liability exceeded the limitations set by those constitutional provisions, thus creating an unconstitutional "debt".
¶ 15 In discussing the constitutionality of funding the State's public pension plans, the Attorney General defined the term "unfunded past service liability" as:
 "Past service liability" is that amount of money necessary to amortize the projected benefits payable in the future to members of the retirement system, who have not yet retired, as computed on the basis of their present salary, years of service, and actuarially determined life expectancies. Stated another way, "past service liability" is the amount of money which, considering the principal and projected income from the investment of principal, will discharge all future claims of system membership for benefits assuming no change in benefits. If a particular annuity plan, public or private, does not have sufficient funds on hand to amortize the "past service liability," the "past service liability" is "unfunded" in the amount of the deficiency.
A.G. Opin. 81-53[5] (emphasis added).
¶ 16 In discussing whether the State of Oklahoma could legally fund the "unfunded past service liability" of the state public retirement systems without violating the specific constitutional provisions at issue, the Attorney General opined:
 "Unfunded past service liability" is not an ordinary expense of the state. Indeed, it is not an expense at all. Past service liability is by definition a projection of future normal costs. To the extent some portion of the past service liability is "unfunded" future increases in the normal costs of these retirement systems can be anticipated and the Legislature can make provisions for satisfaction of those normal costs. Nothing in Okla. Const., Art. X, §§ 2, 3, and 23 require the Legislature to enact revenue legislation to defray any expenses other than those attributable to the current fiscal year, except bonded indebtedness.
A.G. Opin. 81-53 (emphasis added).
¶ 17 Attorney General Opinion 81-53 further provided that the "unfunded past service liability" of the state public retirement plans was not a "debt" as that term is used in Okla. Const. art. X, §§ 4, 23-25. The opinion cited Board of County Commissionersof Lincoln County v. Oklahoma Public Employees RetirementSystem, 405 P.2d 68 (Okla. 1965), for its holding that the obligations imposed on local political subdivisions of the State by legislatively mandated retirement systems do not create an unconstitutional "debt" under Okla. Const. art. X, § 26.
¶ 18 In addressing how the "normal costs" and "unfunded costs" of public retirement systems are to be met by the State of Oklahoma, the Attorney General advised:
 The Legislature is not constitutionally bound to provide out of current revenues funds sufficient to fully amortize anticipated costs of a legislative program for future years. The fiscal year cost of the Teachers' and Public Employees' Retirement Systems must be met as annual, ordinary expenses of government. If revenues of the State as a whole and as restricted by Art. X, § 23 are insufficient to meet the current fiscal year expenses, new revenue measures must be enacted to deal with that eventuality; or government spending must be reduced to balance the budget. The Legislature has broad latitude to set spending priorities, lay additional taxes or otherwise adjust the fiscal affairs of state to deal with this contingency. No single constitutional provision or combination of constitutional provisions specify how a revenue deficiency for one or more legislative programs must be met. The Constitution merely provides that the budget of the State must be balanced and endows the Legislature with the requisite powers of sovereignty necessary to accomplish the task.
(Emphasis added).
¶ 19 In a holding very similar to the conclusion reached by this office in A.G. Opin. No. 81-53, the Arizona Supreme Court found that "[o]bligations which have not been voluntarily incurred but which have been imposed by state law have been held not to be debts in the constitutional sense." Rochlin v. State,540 P.2d 643, 648 (Ariz. 1975)[court citing Columbia County v.Board of Trustees, 116 N.W.2d 142 (1962)].
¶ 20 In Rochlin, the City of Nogales and two of its resident taxpayers sued the State of Arizona contending that the "unfunded liability" of the state and its political subdivisions under the state retirement system was a debt under the Arizona Constitution, and the unfunded liability exceeded the debt limitations of the applicable sections of the constitution. In addition to finding that unfunded liability is not a debt under the Arizona Constitution, the Arizona court also found that "only upon retirement do the benefit payments become a current expense of the State". . . thus the "so-called `unfunded liability' amount is not part of the necessary ordinary expenses of the State. It is by its very nature a future cost not a current one."Id. 540 P.2d at 649.
¶ 21 Clearly, A.G. Opin. 81-53 and Rochlin addressed the issue of unfunded obligations of state pensions systems under the fiscal and budgetary articles of the Oklahoma and Arizona Constitutions. With regard to Okla. Const. art. X, §§ 2, 3, 4 and 23-26, the passages of A.G. Opinion 81-53 remain persuasive regarding the necessity of funding "normal costs", "unfunded liability" and "ordinary expenses." We also concur with the conclusions in A.G. Opin. 81-53 that the Legislature is not constitutionally bound to provide out of current revenues funds sufficient to "fully amortize" anticipated costs of legislative programs and that "[n]o single constitutional provision or combination of constitutional provisions specify how a revenue deficiency for one or more legislative programs must be met." (Emphasis added.)
¶ 22 However, a constitutional examination under your first question must go beyond the issue of whether a public pension's unfunded liability constitutes an unconstitutional "debt." In order to determine whether the State of Oklahoma is currently constitutionally liable for funding all or some level of the existing UAAL in one of its public pension plans, this office must expand our examination of these terms and their actuarial counterparts, and view UAAL from an entirely different perspective, i.e., the constitutional effect on public employees' pension rights.[6]
D. Oklahoma Public Pension Rights Revisited
¶ 23 It is axiomatic to state that in Oklahoma, public employees acquire contractual rights to their retirement benefits. See Baker v. Oklahoma Firefighters Pension andRetirement System, 718 P.2d 348, 351 (Okla. 1986). As stated in Attorney General Opinion 95-45, the Oklahoma Supreme Court has recognized that "those Plaintiffs whose retirement rights are vested have contract rights. . . ." Taylor v. State andEducation Group Insurance Program, 897 P.2d 275, 279 (Okla. 1995) (court citing Baker, 718 P.2d at 353).
¶ 24 It is also clear that the contractual rights acquired by public employees are derived from statute. The Oklahoma Supreme Court has stated:
 [T]he right of a claimant to a pension is controlled by the terms of the statute. . . .
Baker, 718 P.2d 351 (court citing Board of Trustees v. Burns,348 P.2d 1067 (Okla. 1959); and Board of Trustees v. Naughton,173 P.2d 425 (Okla. 1946) (emphasis added).
¶ 25 Attorney General Opinion 95-45 generally examined the nature of public pension rights in Oklahoma, and determined that these rights existed in the following forms — "absolute" rights, statutory "service vested" rights and "contractually based" retirement rights:
 "Absolute" rights are those protected under Article II, § 15 of the Oklahoma Constitution, and are acquired by plan members at the point they become eligible to retire and receive pension payments;
 Statutory "service vested" rights are those expressly created under the statutory provisions of the public retirement system statutes. This form of vested rights granted by the Oklahoma Legislature, while not "absolute" until a member becomes eligible for retirement payments, represents a recognition that each member acquires fixed and immutable rights to certain benefits provided by the system's retirement scheme at the time the member completes applicable service eligibility requirements;
 "Contractually based" pension rights while not rising to the level of service vested or absolute rights, exist in the state pension systems' statutory schemes and consist of a members's right to a substantial or reasonable pension. Contractually based pension rights do not include the right to any particular benefit or pension calculation formula. A contractually based pension right is not "modified" under the hereinafter discussed "Oklahoma rule" by legislative amendment to a public pension benefit structure unless the proposed amendment deprives members of the right to substantial or reasonable pension.
See A.G. Opin. 95-45.
¶ 26 In Taylor, the Oklahoma Supreme Court reviewed a challenged legislative enactment which transferred nearly $40 million from the OTRS to the Oklahoma State Education and Employees Group Insurance Program ("OSEEGIP") to establish health insurance benefits and reserves for OTRS members. In its decision, the Oklahoma Supreme Court recognized that the "courtsare empowered to protect retirement funds" in proper cases.Taylor, 897 P.2d at 279.
¶ 27 The Taylor Court further provided that in Oklahoma,public employees' pension rights are "contractually based" and announced that Oklahoma followed the "majority rule" regarding the Legislature's ability to modify employees rights:[7]
 [W]hile public employees' pension rights are contractually based, and are trust funds, the legislature may modify them if modification is necessary and reasonable, and any disadvantages employees suffer through changes are offset by new advantages . . . it is for the courts to determine upon the facts of each case what constitutes a permissible change.
Taylor, 897 P.2d at 279 [Court citing Betts v. Board ofAdministration, supra, and Allen v. City of Long Beach,45 Cal.2d 128, 287 P.2d 765 (1955) (emphasis added)].
¶ 28 The Taylor Court added an additional factor to the "majority rule" to create the "Oklahoma rule":
 Such modifications, in addition to being necessary, reasonable, and providing offsetting advantages to any disadvantages, will be approved only if they do not impair the actuarial soundness of the fund, or detrimentally affect vested rights, which are matters of proof.
Taylor, 897 P.2d at 279 (emphasis added).
¶ 29 In Taylor, the Oklahoma Supreme Court expressly stated that the adoption of the modified majority rule served as a"valuable tool to protect public employees retirement benefits."Id.; (court citing the landmark cases of Valdes v. Cory,139 Cal.App.3d 773, 791 (1983) and Dadisman v. Moore,384 S.E.2d 816, 827 (W.Va. 1988) ("Dadisman I"). In finding that the transfer of funds from OTRS to OSEEGIP did not violate the "Oklahoma rule", the Court stated:
 Nonetheless, we would not hesitate to find that its terms had been violated in a situation where the actuarial soundness of the fund were threatened, and contract rights of retired public employees and those eligible for retirement were unreasonably impaired.
Taylor, 897 P.2d at 280 (emphasis added).
¶ 30 Therefore, in Oklahoma, any legislative modifications to public pension rights which threaten the actuarial soundness of a state retirement fund or unreasonably impair a public employee's vested rights will not be judicially affirmed. It can also be anticipated that future legislative changes which enhance the actuarial condition of a system will be acceptable so long as any impairments to public employee contract rights which result from the enhancement are found to be reasonable and are offset by new advantages for the affected public employees. However, neitherTaylor nor existing Oklahoma jurisprudence address the question of whether the Legislature's failure to adequately fund existinglevels of UAAL can be deemed to be an impairment of a public employee's pension rights. Therefore, an examination of case law from other jurisdictions is necessary.
E. Other States' Views — Impairment of Contract
¶ 31 In Dadisman I, 384 S.E.2d 816 (W.Va. 1988), the West Virginia Legislature withheld statutorily required contributions from the West Virginia Public Employees Retirement System ("WPERS") for four consecutive fiscal years, and, instead, transferred the funds into the state's general fund. As a result,WPERS became underfunded by "some eighty million dollars."Id. 384 S.E.2d at 823. The Chairman of the WPERS' Board of Trustees, who instituted the lawsuit against the Governor and the Legislature, argued that because the State had not properly funded the System and it had become actuarially unsound, the State had unconstitutionally impaired the contracts of West Virginia public employees under the United States and West Virginia constitutions.[8]
¶ 32 The Dadisman I court rejected the State's argument that the long-standing underfunding of its public employees' retirement system constituted merely a technical, rather than a substantial impairment of the State of West Virginia's contract with its public employees and retirants.[9] The Court also rejected the State's argument that since pension benefits were currently being paid to State employees, any impairment of contract was minimal. Thus, the State, citing Kosa v. Treasurerof the State of Michigan, 292 N.W.2d 452, 460 (Mich. 1980), had attempted to persuade the Court that "[a] clear distinction mustbe drawn between the right to receive pension benefits and thefunding method adopted by the legislature to assure that moniesare available to the payment of such benefits." Dadisman I,384 S.E.2d at 827.
¶ 33 The Dadisman I Court noted that this same argument was made to and rejected by the California Supreme Court in Valdesv. Cory, 139 Cal.App.3d 773, 189 Cal.Rptr. 212 (1983); the Washington Court in Weaver v. Evans, 495 P.2d 639 (Wash. 1972); and the Pennsylvania Court in Dombrowski v. City ofPhiladelphia, 245 A.2d 238 (Pa. 1968) and stated:
 Those cases found that even where a unilateral reduction in the State's share of pension contributions, as earned by State employees, does not result in out of pocket losses for plan participants, they still have a vested interest in the integrity and security of the funds available to pay future benefits.
Dadisman I, 384 S.E.2d at 828 (emphasis added).
¶ 34 The Dadisman I Court, without expressly referencing the "majority rule," also noted that none of the State officials involved argued that the underfunding served to keep the pension system sound and flexible or was offset by comparable new advantages to the participants. Dadisman I 384 S.E.2d at 828. In concluding its discussion regarding impairment of contract, the West Virginia Court stated:
 Our State's Legislature is not the first to yield to the temptation of diverting pension funds in hard economic times. As was observed over a decade ago, "[o]n several occasions, governments have failed to continue the actuarial appropriations they had promised to make to the pension system, and courts have uniformly held these missed appropriations to be contract violations." [Court citing Note, Public Employee Pensions in Time of Fiscal Distress, 90 Har.L.Rev. 992, 1006 (1977)].
Dadisman I, 384 S.E.2d at 828 (citing Note, Public EmployeePensions in Time of Fiscal Distress, 90 Harv. L. Rev. 992, 1006 (1977)) (emphasis added).
¶ 35 Thus, the Dadisman I Court found that the underfunding of the West Virginia Public Employees Retirement System trust was a substantial impairment of the State's contract with its employees and retirees, and that it violated the State and Federal constitutional prohibitions against impairments of contracts, notwithstanding that pension benefits were being paid.See Dadisman I 384 S.E.2d at 827.
¶ 36 In contrast to the holding in Dadisman I, are the cases of Kosa, supra, Minneapolis Teachers Retirement Fund v. State,490 N.W.2d 124, 129 (Minn.App. 1992). and Geary v. AlleghenyCounty Retirement Board, 231 A.2d 743 (Pa. 1967).
¶ 37 In Minneapolis Teachers, the court found that the statutes authorizing the creation of the Teachers' Retirement Fund did not create a contractual right to employer contributions to the retirement fund in amounts that maintain the actuarial soundness of the fund. Minneapolis Teachers Retirement Fund,490 N.W.2d at 129. The Minnesota court held that there had been no promise by the state that contributions would be made to the fund on an annual or any other basis in an amount that would keep the fund actuarially sound. Id., 490 N.W.2d at 128. The court further found that no language in the pension fund's enabling legislation or any subsequent legislation could be interpreted as a promise to make employer contributions in an amount that would keep the fund actuarially sound. Id. The Minnesota court reasoned that if no promise of actuarial soundness was ever made by statute, there was no contract to be unconstitutionally impaired. Id. at 490 N.W.2d 130.
¶ 38 It is important to note that Minnesota, unlike West Virginia and Oklahoma, does not recognize that public employees have contractual rights to their state pensions. Instead, protectable rights of public employees in Minnesota to state pensions are only determined by applying the doctrine of promissory estoppel. Minneapolis Teachers, 490 N.W.2d at 128. This major difference is important for Oklahoma public employees, who do acquire contractually based pension rights.
¶ 39 In Geary, the Pennsylvania Supreme Court addressed the constitutionality of an act which permitted a policeman to retire at age 55 instead of the age previously established by statute, 60. The basis of the constitutional challenge in that case was the assertion that the reduction of the retirement age decreasedthe actuarial soundness of the retirement fund and therefore, unconstitutionally impaired the city employees' contract rights.
¶ 40 The Geary court, bearing in mind the strong presumption in favor of the constitutionality of legislation, concluded that a legislative alteration of retirement laws whose only adverse affect on participants was to "increase a theoreticalpossibility that payments to them will not be met" was not a sufficiently concrete detriment to constitute a violation of constitutional guarantees. See Geary, 231 A.2d at 746 (emphasis added). However, in a second Pennsylvania case decided one year later, Dombrowski v. City of Philadelphia, 245 A.2d 238 (Pa. 1968) (cited in Dadisman I), the Pennsylvania Supreme Court found that there was an unconstitutional impairment of contractual rights between the City and its employees where thethreat that retirement payments would not be met was more thantheoretical or possible, but that instead, the city's retirementsystem "was Actually and Presently unsound." See Dombrowski,245 A.2d at 247 (emphasis added).
¶ 41 In Dombrowski, the Court affirmed the trial court's finding that the appropriations made by the City of Philadelphia to its municipal retirement plan were insufficient to maintain the System in an "actuarially sound condition." Id.,245 A.2d at 240. The Court's recognition of the trial court judge's conclusions are especially helpful in understanding the concept of "actuarial soundness":
 [F]or a public retirement system, actuarial soundness requires that the municipality contribute a sum of money each year sufficient to cover the "normal cost" for that year plus interest on the system's" unfunded accrued liability.". . . Since it is unlikely that a municipality will cease to exist (as contrasted with the typical private, corporate retirement system), actuarial soundness demands that the public retirement system be . . . only "partially funded," i.e., the contributions to the system each year must be sufficient to cover normal cost plus Interest on the system's unfunded accrued liability. Where the appropriations are not sufficient to meet this amount, the accrued liability increases until the system is forced to operate on a cash disbursement basis (a pay-as-you-go-system), a system which . . . [is] actuarially unsound. . . .
Dombrowski, 245 A.2d at 240 (emphasis added).[10]
¶ 42 Based upon the Oklahoma Supreme Court's willingness inTaylor to find an impairment of contractual pension rights under the "Oklahoma rule" when the actuarial soundness of an Oklahoma public pension fund is "threatened," and specifically the Court's express recognition that courts are empowered to protect retirement funds, Dadisman and Dombrowski are persuasive.
¶ 43 In light of the above-analysis, the response to your first question is as follows. Oklahoma's public retirement system statutes (which expressly and impliedly require annual, fiscal year actuarial funding), coupled with the doctrines embraced by the Taylor and Dadisman I decisions, require that the State of Oklahoma both fund the UAAL of its public retirement systems to a level of "actuarial soundness" and amortize the unfunded liability of each System at the rate and term required in an individual System's statutes.
¶ 44 Should the State of Oklahoma fail to fund the UAAL of any of its public pension systems to a level which would prevent a System from amortizing its unfunded accrued liability at the rate and term required by that System's statutes, or should the State allow a System to become "presently and actuarially unsound," such a failure would constitute an impairment of the contractual rights between the State and the public employee members of the affected System.
¶ 45 Whether a state System is being funded pursuant to its statutory funding statutes or whether the System can be considered "presently and actuarially unsound" are questions of fact which cannot be answered in an opinion of the Attorney General,[11] but instead, must be determined on a case-by-case basis by a court of competent jurisdiction.[12] Upon a determination of actuarial unsoundness, a court would then need to decide what measures could be judicially mandated to return the System to actuarial soundness. See Dadisman II, 413 S.E.2d at 687.
F.Unconstitutional Impairment of Contract
¶ 46 It is important to note that a determination that the State's failure to fund a certain level of the existing UAAL of one of its retirement systems constitutes an impairment of a public employee's pension rights, does not necessarily violate the contract clause of the Oklahoma[13] and United States[14] constitutions. See Taylor, 897 P.2d at 279. As noted in A.G. Opinion 95-45, the Legislature is not absolutely barred from impairing existing public employee rights under the State retirement plans. Any State action which created or contributed to the UAAL of a State retirement system may withstand constitutional scrutiny if the modifications satisfy the tripartite test created by the United States Supreme Court inUnited States Trust Co. v. New Jersey, 431 U.S. 1,97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The three factors which must be satisfied before the contract clause can said to have been violated are:
 The reviewing court must find that (1) the contractual obligation at issue arose under statute, (2) the state's actions impaired an obligation of that contract, and (3) the impairment was not "reasonable and necessary to serve an important public purpose."
Taylor, 897 P.2d at 275. (citing United States Trust Companyv. New Jersey).
¶ 47 Because your question fails to identify any singular enactment or series of State actions which might have created or contributed to the UAAL of one of the State retirement systems and has consequently left a System in a "presently and actuarially unsound" condition; it cannot be specifically determined whether this form of impairment to employees' pension rights is unconstitutional under United States Trust Co. v. NewJersey.
¶ 48 However, in addition to the holdings in Dadisman I,Dombrowski, Valdes, and Weaver, several jurisdictions, upon examining legislation which impairs public pension rights, have found that such rights were unconstitutionally impaired, even when the legislation was designed to improve the fiscal strength of the public plan. See United Firefighters v. Los Angeles,259 Cal.Rptr. 65, 73, 210 Cal.App.3d 1101, 1111 (Cal.App. 2 Dist. 1989) cert. denied, 493 U.S. 1045, 110 S.Ct. 843,107 L.Ed.2d 837 (1990) (evidence established that the growth of the pension systems' unfunded liabilities to $3.37 billion occurred primarily because the City of Los Angeles had taken a number of actions which failed to conform to sound actuary practice in the area of pension funding);[15] Catania v. Commonwealth ofPennsylvania, State Employees Retirement Board, 455 A.2d 1250,1257 (Pa. 1983) (court found that benefit reductions to statutory retirement plan to enhance actuarial strength of fund constituted a net detriment to state employees and was a constitutionally impermissible impairment of contract); Singer v. City ofTopeka, 607 P.2d 467 (Ks. 1980) (using "majority rule," court rejected City's claim that the actuarial soundness of the local plan would be advantageous to the members and held that legislation which increased contributions of members without granting increases in benefits unconstitutionally contravened contract clause);[16] Calabro v. City of Omaha,531 N.W.2d 541 (Neb. 1995) (court used "majority rule" to find record devoid of evidence that the City of Omaha had conferred an additional benefit on members in exchange for legislatively eliminating a supplemental retirement benefit).
¶ 49 Other jurisdictions have not been as willing to find an unconstitutional impairment to public pension rights when the legislative modifications improved the fiscal integrity of the public plan. See Maryland State Teachers' Assoc. v. Hughes,594 F.Supp. 1353, 1370 (D.Md. 1984) (court held amendment to state retirement plan which was prospectively applied and was necessary to preserve fiscal integrity of System was not a "drastic" impairment, thus appropriate); Houghton v. Long Beach,330 P.2d 918 (1958) (court found that increase in employee contributions without compensating increase in benefits was proper upon showing by city that additional revenues would result in improved financial stability for the system).
G. Post-Impairment Legislation
¶ 50 Finally, the State of West Virginia has held that, through legislation, the State can eliminate the need for a court to judicially mandate measures to return a System to actuarial soundness after a finding that the state has impaired the contract rights of its public employees.
¶ 51 In another West Virginia case decided subsequent toDadisman I, several active and retired educators and education groups filed suit against the State of West Virginia, its Governor, State Senate, State House of Delegates and Public Retirement Board alleging that the defendants had unconstitutionally impaired their contractual obligations to the educators by administering the West Virginia Teachers' Retirement System ("WVTRS") in an actuarially unsound manner. West VirginiaEducation Association v. Consolidated Public Retirement Board,460 S.E.2d 747, 751 (W.Va. 1995).
¶ 52 In that case, the West Virginia court found that because of inadequate appropriation requests from the Governor for the fiscal years 1985-88, and 1984 and 1988 legislative amendments to the WVTRS plan which authorized reserve fund spending for current benefit payments and payment of retiree health insurance premiums, the WVTRS had accumulated an unfunded accrued liability of $3.25 billion, an amount which made the System actuarially unsound. Id., 460 S.E.2d at 752-753, 756 fn. 26. Applying the standards enunciated in Dadisman I to an examination of the WVTRS' unfunded liability, the court held that the inadequate funding was invalid since it violated the prohibition against impairment of contractual rights contained in the federal and state constitutions. Id., 460 S.E.2d at 756.
¶ 53 During the pendency of the lawsuit, the West Virginia Legislature passed an enactment in extraordinary session which "provided a [statutory] mechanism through the public school support program for supplemental appropriations to be paid into the [WVTRS] over the next forty years." West Virginia EducationAssociation, 460 S.E.2d at 754. The West Virginia court held that the curative legislation represented "a `valid and recognizable supervening circumstance' which commands this Court to decline to decide the issue relating to measures to correct the unfunded liability of the [WVTRS] since that issue has lost its `controversial vitality — it is moot.'" Id.460 S.E.2d at 757. Thus, the court found that with the enactment of the affected legislation, "West Virginia is now funding its Teachers' Retirement System on an actuarially sound basis. This legislation [cite omitted] finally provides a definitive solution to the nagging problem of one of our state's two largest debts — the three billion Unfunded Liability of its largest retirement system." Id.
 II. STATE'S OBLIGATION TO ANNUALLY AND ULTIMATELY FUND RETIREMENT BENEFITS
¶ 54 Your second question essentially asks this office to determine the obligation of the State of Oklahoma to annually and ultimately fund the promised retirement benefits of the State's public retirement systems to vested members while your third question asks whether the State of Oklahoma would be liable upon financial default of one of the State of Oklahoma's statewide public retirement plans. Because of the underlying similarities in the legal analysis required to address both of these questions, they will be addressed together.
¶ 55 The Oklahoma Legislature has statutorily required that the state retirement systems be actuarially funded on an annual, fiscal year basis. See, 11 O.S. 1991, § 49-100.8[11-49-100.8]
(Firefighters); 11 O.S. 1991, § 50-105.3[11-50-105.3] (Police); 20 O.S.Supp. 1996, § 1108[20-1108](A) (Judges); 47 O.S. 1991, §2-308.2[47-2-308.2](3)(OLERS); 70 O.S. Supp. 1996, § 17-106[70-17-106](19) (20) and (21)(OTRS); and 74 O.S. Supp. 1996, § 920[74-920](5) and (6)(OPERS). As stated, such required annual funding is one of the contractually-based rights referred to in Taylor,[17]supra, and has been designed to provide for the payment of current "normal costs," including annual retirement benefit obligations, as well as the amortization of unfunded accrued liabilities.
¶ 56 In order to meet the financial obligations imposed by its actuarial funding mandates, the Legislature has obligated the State of Oklahoma and its political subdivisions to annually fund the six statewide retirement systems either through direct appropriations, dedicated tax revenues or state employer contributions. In addition, for certain state plans, the Legislature has also statutorily required employer contributions from non-state entities such as counties, municipalities and local school districts to accomplish these actuarial funding requirements. See, e.g., 11 O.S. Supp. 1996, § 49-122[11-49-122]
(Firefighters); 11 O.S. 1991, § 50-109[11-50-109] (Police); 70 O.S. Supp.1996, § 17-108[70-17-108] (OTRS) and 74 O.S. Supp. 1996, § 920A[74-920A]
(OPERS). However, the fact that the Legislature has statutorily included these entities in its funding mandates for public pension plans, does not relieve the State of its liability or duty to pay current and future retirement benefits should the participating local employers fail to meet their statutory obligations with the State.[18] Instead, as previously explained, the State would remain ultimately responsible for these funding costs because of its contractual and constitutional obligation to its public employees to fund the state pension systems on an actuarially sound basis. See Valdes, 189 Cal.Rptr. at 225
(Legislature's recision of existing appropriations for employer contributions theoretically representing the employers on-going share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees substantially impaired public employees' assurance that they will ultimately receive the retirement benefits to which they had become entitled).
¶ 57 Thus, in response to your second question, the State of Oklahoma has a statutory, contractual, and constitutional duty to annually and ultimately fund the retirement benefits of current Oklahoma public employees who have acquired "vested" pension rights in the form of "absolute" rights and "service vested" rights, as acquired under the statutory retirement formulas of the state pension plans. The payment of statutorily promised pension benefits, on maturity, is also a general obligation of the State. See, Dadisman I, 384 S.E.2d 829;[19] see alsoValdes, 189 Cal.Rptr. at 212 (The payment of statutorilydefined benefits, upon maturity, is a general obligation of thestate regardless of sums existing in the retirementfund. . . .).[20] The State of Oklahoma cannot divest its current public employees of their existing pension rights except by due process, although prospective modifications which do not run afoul of federal or state impairment clauses may be possible. See Dadisman I, 384 S.E.2d at 828-29.
¶ 58 In Booth v. Simms, 456 S.E.2d 167, 184 (W.Va. 1994), the Supreme Court of West Virginia stated:
 [W]e have emphasized the legislature's obligation to fund pension systems on a sound actuarial basis. We are not administrators, however, and we can only articulate what the law is. It is for the governor and the legislature to enforce the law . . . although the actuarial funding of the pension program may be an interesting issue for lawyers, it means nothing to lay persons who work for the state as troopers, secretaries and janitors and whose expertise is not in the law. Upon attaining eligibility, workers expect to collect their pensions, and their contracts do not condition these benefits upon actuarial soundness of the system. Consequently, the funding of any pension program is the legislature's problem — not the state employees' — and once the legislature establishes a pension program, it must find a way to pay the pensions. . . .
Booth v. Simms, 456 S.E.2d 167, 184 (W.Va. 1994) (emphasis added).
¶ 59 As for "contractually based" pension rights, it has been stated these rights exist in the state pension systems' statutory schemes and consist of a member's right to a substantial orreasonable pension. A.G. Opin. 95-45. These pension rights do not include the right to any particular benefit or pension calculation formula and are not "modified" under the "Oklahoma rule", by legislative amendment to a public pension benefit structure unless the proposed amendment deprives members of the right to substantial or reasonable pension. See Id.
¶ 60 Because the State of Oklahoma has a general, statutory, contractual and constitutional duty to annually and ultimately fund the retirement benefits of current Oklahoma public employees who have acquired "vested" pension rights in the form of "absolute" rights and "service vested" rights, it must be concluded that the State of Oklahoma has the same responsibility to financially stabilize an insolvent public retirement plan before a default can occur. As stated in Attorney General Opinion 81-53:
 If revenues of the State as a whole . . . are insufficient to meet the current fiscal year expenses, new revenue measures must be enacted to deal with that eventuality; or government spending must be reduced to balance the budget. The Legislature has broad latitude to set spending priorities, lay additional taxes or otherwise adjust the fiscal affairs of state to deal with this contingency. No single constitutional provision or combination of constitutional provisions specify how a revenue deficiency for one or more legislative programs must be met.[21]
¶ 61 Thus, in response to your third question —
 1. The State of Oklahoma has a legal obligation to use all resources and fiscal means available in an effort to fund or stabilize an insolvent state retirement plan before a default can occur in order to fulfill its general, statutory, contractual and constitutional duties to its vested public employees.
 2. This obligation cannot be abrogated by the State unless doing so would cause the State of Oklahoma to become insolvent. As stated previously, the State, not the individual systems, is ultimately responsible for the funding of its public retirement plans based upon its contractual and constitutional obligations to its public employees.
 3. An attempt by the State of Oklahoma to abrogate its financial obligations to a public retirement plan's members prior or subsequent to a System's default while the State is solvent, would be cause for a judicial examination into whether the State had unconstitutionally impaired the contractual or due process rights of its public employees.
¶ 62 Past examinations by the various courts have generally not permitted such attempts. See Dadisman I, 384 S.E.2d at 828-29;see also United Firefighters, 259 Cal.Rptr. at 73 (Californiacourt found that because the City of Los Angeles still had theability to levy a separate ad valorem property tax specificallyto meet the pension system funding requirements, the city could not meet the reasonable and necessary requirements set forth byUnited States Trust Company v. New Jersey — court also recognized the established principal that a desire to reducecost or limit public spending does not justify the abrogation ofa public entity's contractual obligations notwithstanding the legitimacy of such a public purpose[22] Id. (court citingLynch v. United States, 292 U.S. 571, 580, 54 S.Ct. 840, 844,78 L.Ed. 1434 (1934), cited with approval in United States TrustCo., supra, 431 U.S. at 26, n. 25, 97 S.Ct. at 1519, n. 25);Calabro v. City of Omaha, supra, (Nebraska Supreme Courtrejected the City of Omaha's "fiscal crisis" argument that eliminating a supplemental benefit plan was necessary in order to allow the City to avoid having to face potential bankruptcy — because the City had not convinced the court that termination ofthe plan was the only viable alternative, and noted that the "necessity" component of the reasonable and necessary test be considered in two levels: (1) whether a less drastic modification of contractual obligations would have been sufficient to accomplish the city's purposes and (2) whether, without modifying its obligations at all, the City could have adopted alternative means of achieving its goals); Pineman v. Oechslin,494 F.Supp. 525, 552 (D.Conn. 1980) (court found unconstitutional contractual impairment of retirement system member's rights because the general assembly was not forced to choose between abrogatingits contractual commitments or permitting the state to becomeinsolvent); Halpin v. the Nebraska State Patrolmen's RetirementSystem, 320 N.W.2d 910, 915 (Neb. 1982) (court found no evidence that continued financial integrity of the system depended upon exclusion of certain contested payments or that the retirementsystem was "forced to choose between abrogating [their]contractual commitments or permitting the state to becomeinsolvent"); Miles v. Tennessee Consolidated RetirementSystem, 548 S.W.2d 299, 305 (Tenn. 1977) (court found thatlegislation passed to alleviate funding problems of the pensionsystem did not protect a vital interest of the state).
 III. STATE'S RESPONSIBILITY TO FUND UNFUNDED ACTUARIAL ACCRUED LIABILITY WHICH EXISTED AT TIME STATE ASSUMED CONTROL OF THE POLICE AND FIREFIGHTERS' SYSTEMS
¶ 63 In your fourth inquiry, you essentially ask whether the State of Oklahoma is liable for that portion of UAAL which existed January 1, 1981, when the State statutorily consolidated all existing municipal police and firefighter retirement funds and created the Oklahoma Police Pension and Retirement System and the Oklahoma Firefighters Pension and Retirement System.
¶ 64 In Attorney General Opinion 81-56, this issue was presumptively addressed when the Attorney General was asked to determine whether the assumption by the State of Oklahoma of theobligation to provide unfunded benefits for the past servicerendered by police officers and firefighters, pursuant to 11O.S. Supp. 1980, §§ 49-100.2[11-49-100.2], 49-119, 50-102.1 and 50-109, was violative of Article X, §§ 15, 16 and 20 of the Oklahoma Constitution.
¶ 65 In that opinion, it was demonstrated that in 11 O.S.Supp. 1980, § 49-100.2[11-49-100.2], the Oklahoma Legislature created the Oklahoma Firefighters Pension and Retirement System, and expressly reserved in the State of Oklahoma, the responsibility of providing retirement benefits to all member firefighters of participating municipalities. Section 49-100.2 provided in pertinent part that:
 This System shall be the responsibility of the State and not that of the participating municipalities.
(Emphasis added.)
¶ 66 This language remains in the current version of Section 49-100.2.
¶ 67 In 1981, as well as today, Section 49-119 of Title 11 contained the following language:
 In addition, the State of Oklahoma shall make such appropriation as is necessary to assure the retirement benefits provided by this article.
(Emphasis added).
¶ 68 Similarly, in 11 O.S. Supp. 1980, § 50-102.1[11-50-102.1], the Oklahoma Legislature created the Oklahoma Police Pension and Retirement System. In language that remains in force and effect presently, Section 50-102.1 evidences the Legislature's intent that the State of Oklahoma bear the responsibility of providing retirement benefits to all member police officers of participating municipalities. Section 50-102.1 provides in pertinent part:
 This System shall be the responsibility of the State and not that of the participating municipalities.
(Emphasis added.)
¶ 69 In 1981, Section 50-109 provided, and continues to provide in pertinent part:
 The State shall make such appropriation as is necessary to assure the retirement benefits provided by the article.
(Emphasis added.)
¶ 70 In concluding that the assumption by the State of Oklahoma of the obligation to provide unfunded benefits for the past service rendered by police officers and firefighters was not a violation of Article X, §§ 15, 16 and 20 of the Oklahoma Constitution, this office relied on the express provisions of the afore-cited statutory provisions and the case of Wallace v.Childers, 180 P.2d 1005, 1009 (1947), in which the Oklahoma Supreme Court stated:
 The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever.
¶ 71 Again, the conclusions reached in A.G. Opin. 81-56 remain persuasive today. The plain language of the Oklahoma Police Pension and Retirement System and the Oklahoma Firefighters Pension and Retirement System statutes require that the Systems annually determine the actuarially required rate of contributions needed to pay all liabilities, including the amortization of unfunded accrued liabilities, and the State of Oklahoma shall assume responsibility for and appropriate the necessary retirement benefit funding for these two Systems. See 11 O.S.1991, § 49-100.8[11-49-100.8]; 11 O.S. 1991, § 50-105.3[11-50-105.3]. When the intent of the Legislature is plainly expressed in a statute, it must be followed without further inquiry or statutory construction.In re Request of Hamm Production Co., 671 P.2d 50, 52
(Okla. 1983).
¶ 72 As explained previously, almost every public pension plan, at its inception, incurs an unfunded liability to employees entering it because of their years of prior credible service existing at the date of inception, as to which years no contributions or funding have previously been made either by the employer or the employees. See Blackwell v. Quar-terly CountyCourt, Etc., 622 S.W.2d 535, 541 (Tenn. 1981). Therefore, it must also be concluded that when the State of Oklahoma created the Oklahoma Police Pension and Retirement System and the Oklahoma Firefighters Pension and Retirement System, it also legally assumed the unfunded liability, including the UAAL, which existed at that time.
¶ 73 Therefore, it is the official Opinion of the AttorneyGeneral that:
1. The Legislature has statutorily obligated the State ofOklahoma to actuarially maintain the funding of its publicretirement plans. 11 O.S. 1991, §§ 49-100.1[11-49-100.1] et seq., and11 O.S.Supp. 1996, §§ 49-100.1[11-49-100.1] et seq., specifically 11O.S. 1991, § 49-100.8[11-49-100.8], 49-119 (Firefighters); 11 O.S. 1991,§§ 50-101[11-50-101] et seq., and 11 O.S.Supp. 1996, §§ 50-101[11-50-101] etseq., specifically 11 O.S. 1991, § 50-105.3[11-50-105.3], 50-109(Police); 20 O.S. 1991, §§ 1101[20-1101] et seq., and 20 O.S.Supp.1996, §§ 1101[20-1101] et seq., specifically 20 O.S. Supp. 1996, §1108(A) (Judges); 47 O.S. 1991, §§ 2-300[47-2-300] et seq., andSupp. 1996, §§ 2-300 et seq., specifically 47 O.S. 1991, §2-308.2(3)(OLERS); 70 O.S. 1991, §§ 17-101[70-17-101] et seq., and70 O.S.Supp. 1996, §§ 17-101[70-17-101] et seq., specifically 70 O.S.Supp. 1996, § 17-106(21)(OTRS); 74 O.S. 1991 §§ 901[74-901] etseq., and 74 O.S.Supp. 1996, §§ 901[74-901] et seq.,specifically 74 O.S. Supp. 1996, § 920(5) and (6)(OPERS).
2. The State of Oklahoma is required to both fund the unfundedactuarial accrued liability of its public retirement systems to alevel of "actuarial soundness" and amortize the unfundedliability of each System at the rate and term required in theindividual System's statutes. 11 O.S. 1991, §§ 49-100.1[11-49-100.1] etseq., and 11 O.S.Supp. 1996, §§ 49-100.1[11-49-100.1] et seq.,specifically 11 O.S. 1991, § 49-100.8[11-49-100.8], 49-119(Firefighters); 11 O.S. 1991, §§ 50-101[11-50-101] et seq., and 11O.S.Supp. 1996, §§ 50-101[11-50-101] et seq., specifically 11 O.S. 1991,§ 50-105.3[11-50-105.3], 50-109 (Police); 20 O.S. 1991, §§ 1101[20-1101]et seq., and 20 O.S.Supp. 1996, §§ 1101[20-1101]et seq., specifically 20 O.S. Supp. 1996, § 1108(A) (Judges);47 O.S. 1991, §§ 2-300[47-2-300] et seq., and Supp. 1996, §§ 2-300et seq., specifically 47 O.S. 1991, § 2-308.2(3)(OLERS);70 O.S. 1991, §§ 17-101[70-17-101] et seq., and 70 O.S.Supp. 1996,§§ 17-101[70-17-101] et seq., specifically 70 O.S. Supp. 1996,§ 17-106(21)(OTRS); 74 O.S. 1991, §§ 901[74-901] et seq., and74 O.S.Supp. 1996, §§ 901[74-901] et seq., specifically74 O.S.Supp. 1996, § 920(5) and (6)(OPERS).
3. Should the State of Oklahoma fail to fund the unfundedactuarial accrued liability of any of its public retirementsystems to a level which would prevent a System from amortizingits unfunded accrued liability at the rate and term required by aSystem's statutes, or should the State allow a System to become"presently and actuarially unsound," such a failure wouldconstitute an impairment of the contractual rights between theState and the public employee members of the affected System.11 O.S. 1991, §§ 49-100.1[11-49-100.1] et seq., and 11 O.S.Supp. 1996,§§ 49-100.1[11-49-100.1] et seq., specifically 11 O.S. 1991, §49-100.8[11-49-100.8], 49-119 (Firefighters); 11 O.S. 1991, §§ 50-101[11-50-101] et seq., and 11 O.S.Supp. 1996, §§ 50-101[11-50-101]et seq., specifically 11 O.S. 1991, § 50-105.3[11-50-105.3], 50-109(Police); 20 O.S. 1991, §§ 1101[20-1101] et seq., and 20 O.S.Supp. 1996, §§1101 [20-1101] et seq., specifically 20 O.S. Supp. 1996, § 1108(A)(Judges); 47 O.S. 1991, §§ 2-300[47-2-300] et seq., and Supp. 1996,§§ 2-300 et seq., specifically 47 O.S. 1991, §2-308.2(3)(OLERS); 70 O.S. 1991, §§ 17-101[70-17-101] et seq., and 70 O.S.Supp. 1996, §§ 17-101[70-17-101] et seq., specifically 70 O.S.Supp. 1996, § 17-106(21)(OTRS); 74 O.S. 1991 §§ 901[74-901] etseq., and 74 O.S.Supp. 1996, §§ 901[74-901] et seq.,specifically 74 O.S. Supp. 1996, § 920(5) and (6)(OPERS).
4. Whether a state retirement system is being funded pursuant toits statutory funding statutes or whether a system has become"presently and actuarially unsound" are questions of fact whichcannot be answered in an opinion of the Attorney General, butinstead, must be determined on a case-by-case basis by a court ofcompetent jurisdiction. 74 O.S.Supp. 1996, § 18b(A)(5).
5. Any failure of the State of Oklahoma to fund the requiredlevel of existing unfunded actuarial accrued liability in one ofits public retirement systems, in addition to constituting animpairment of a public employee's pension rights, would violatethe contract clause of the Oklahoma and United States'Constitutions, unless the State could demonstrate that the Stateaction which created or contributed to a state system's unfundedactuarial accrued liability satisfies the tripartite test createdby the United States Supreme Court in United States Trust Co.v. New Jersey:
(a) the contractual obligation at issue arose under statute;
(b) the state's actions impaired an obligation of that contract;and
(c) the impairment was reasonable and necessary to serve animportant public purpose.
Okla. Const. art. II, § 15; U.S. Const. art I, § 10, cl. 1.
6. The State of Oklahoma has a general, statutory, contractualand constitutional duty to annually and ultimately fund theretirement benefits of current Oklahoma public employees who haveacquired "vested" pension rights in the form of "absolute" rightsand "service vested" rights, as acquired under the statutoryretirement formulas of the state pension plans. 11 O.S. 1991,§§ 49-100.1[11-49-100.1] et seq., and 11 O.S.Supp. 1996, §§ 49-100.1[11-49-100.1] et seq., specifically 11 O.S. 1991, § 49-100.8[11-49-100.8],49-119 (Firefighters); 11 O.S. 1991, §§ 50-101[11-50-101] et seq., and11 O.S.Supp. 1996, §§ 50-101[11-50-101] et seq., specifically11 O.S. 1991, § 50-105.3[11-50-105.3], 50-109 (Police); 20 O.S. 1991, §§ 1101[20-1101] et seq., and 20 O.S.Supp. 1996, §§ 1101[20-1101]et seq., specifically 20 O.S. Supp. 1996, § 1108(A) (Judges);47 O.S. 1991, §§ 2-300[47-2-300] et seq., and Supp. 1996, §§ 2-300et seq., specifically 47 O.S. 1991, § 2-308.2(3)(OLERS); 70O.S. 1991, §§ 17-101[70-17-101] et seq., and 70 O.S.Supp. 1996, §§17-101[70-17-101] et seq., specifically 70 O.S. Supp. 1996, §17-106(21)(OTRS); 74 O.S. 1991 §§ 901[74-901] et seq., and 74O.S.Supp. 1996, §§ 901[74-901] et seq., specifically 74 O.S. Supp.1996, § 920(5) and (6)(OPERS).
7. The State of Oklahoma has a legal obligation to use allresources and fiscal means available in an effort to fund orfinancially stabilize an insolvent state retirement planbefore a default of the system can occur in order to fulfillits general, statutory, contractual and constitutional duties toits vested public employees.
a. This obligation cannot be abrogated by the State unlessdoing so would cause the State of Oklahoma to become insolvent.
b. An attempt by the State of Oklahoma to abrogate its financialobligations to a public retirement plan's members prior orsubsequent to a System's default while the State is solvent,would be cause for a judicial examination into whether the Statehad unconstitutionally impaired the contractual or due processrights of its public employees.
11 O.S. 1991, §§ 49-100.1[11-49-100.1] et seq., and 11 O.S.Supp. 1996,§§ 49-100.1[11-49-100.1] et seq., specifically 11 O.S. 1991, §49-100.8[11-49-100.8], 49-119 (Firefighters); 11 O.S. 1991, §§ 50-101[11-50-101] et seq., and 11 O.S.Supp. 1996, §§ 50-101[11-50-101]et seq., specifically 11 O.S. 1991, § 50-105.3[11-50-105.3], 50-109(Police); 20 O.S. 1991, §§ 1101[20-1101] et seq., and 20 O.S.Supp. 1996, §§1101[20-1101]et seq., specifically 20 O.S. Supp. 1996, § 1108(A)(Judges); 47 O.S. 1991, §§ 2-300[47-2-300] et seq., and Supp. 1996,§§ 2-300 et seq., specifically 47 O.S. 1991, §2-308.2(3)(OLERS); 70 O.S. 1991, §§ 17-101[70-17-101] et seq., and70 O.S.Supp. 1996, §§ 17-101[70-17-101] et seq., specifically 70 O.S.Supp. 1996, § 17-106(21)(OTRS); 74 O.S. 1991 §§ 901[74-901] etseq., and 74 O.S.Supp. 1996, §§ 901[74-901] et seq.,specifically 74 O.S. Supp. 1996, § 920(5) and (6)(OPERS).
8. The State of Oklahoma is legally responsible for that portionof unfunded actuarial accrued liability which existed at the timethe State created the Oklahoma Police Pension and RetirementSystem and the Oklahoma Firefighters Pension and RetirementSystem. 11 O.S. 1991, §§ 49-100.2[11-49-100.2], 49-100.8 and 49-119; 11O.S. 1991, §§ 50-102.1[11-50-102.1], 50-105.3 and 50-109.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
BARRY K. KOONCE ASSISTANT ATTORNEY GENERAL
[1] Almost every public pension plan, at its inception, incurs an unfunded liability to employees entering it because of their years of prior credible service existing at the date of inception, as to which years no contributions or funding have previously been made either by the employer or the employees.See Blackwell v. Quarterly County Court, Etc., 622 S.W.2d 535,541 (Tenn. 1981).
[2] Actuarial studies show that most public or private pension plans have unfunded actuarial liabilities amortized over about 30 years. See Dadisman v. Caperton, 413 S.E.2d 684, 690 (W.Va. 1991) ("Dadisman II").
[3] Under ERISA, contributions by employers must be large enough to amortize, or reduce to zero, the liability of a pension plan in 30 or 40 years. 29 U.S.C. § 1082(b)(2)(B).
[4] This section requires that the State Judicial Retirement Fund be managed in the same manner as OPERS.
[5] Although not discussed or defined in the context of an actuarial methodology in A.G. Opin. 81-53, we find that the terms "normal cost" and "unfunded past service liability" as used therein, are close enough in meaning to the definitions and explanations of "normal cost" and "unfunded accrued actuarial liability" provided in this opinion so as to be legally and functionally synonymous.
[6] Neither A.G. Opin. No. 81-53 nor Rochlin examined the issue of "unfunded liability" in the context of a possible unconstitutional impairment of contract between the state and its public employees.
[7] Commentators have noted that the principles espoused in the "majority rule", also known as the "modified contract approach", avoid the rigid adherence to strict formalistic contract doctrine by balancing the interest of the governmental employer in revising plans to insure their actuarial soundness with the legitimate reliance interest of employees who look to pensions as a substantial benefit accruing from the satisfactory performance of long term service. The essence of the "majority rule" renders the entitlements of both parties subject to reasonable limitations. See Dullea v. Massachusetts Bay Trans-portationAuthority, 421 N.E.2d 1228, 1235 (Mass.App. 1981) (emphasis added).
[8] Notably, the Chairman of WPERS also argued that the underfunding would soon require the State to appropriate taxpayer dollars to meet the obligations of the System.
[9] If a challenger fails to show substantial impairment in their contractual rights by the action of a legislature, a court need not decide under what circumstances a state's contract with its workers could be lawfully impaired. Jones v. Board ofTrustees, 910 S.W.2d 710, 716 (Ky. 1995).
[10] Another case which actuarial underfunding implicated contract right impairment was Hanson v. City of Idaho Falls,446 P.2d 634, 636 (Idaho1968), wherein the Idaho Supreme Court found that a retirement fund must be financially sound and that such a right creates a concomitant duty which in turn is a liability enforceable against the city.
[11] See, 74 O.S.Supp. 1996, § 18b[74-18b](A)(5). The Attorney General may only give his opinion in writing upon questions oflaw.
[12] In State ex rel. Dadisman v. Caperton ("Dadisman II"), the employees sought a writ of mandamus to force the legislature to repay to the pension an amount sufficient to recover for the previous underfunding in Dadisman I. Id.,413 S.E.2d at 686. The court refused, however, and held that such payment was not required as there was no showing that the pension fund was "actuarially unsound" such as to require repayment for past underfunding. Id. at 689.
[13] Okla. Const. art. II, § 15 provides "[n]o . . . law impairing the obligation of contracts, shall ever be passed."
[14] U.S. Const. art I, § 10, cl. 1 provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."
[15] The court in United Firefighters held that a publicentity cannot justify the impairment of its contractualobligations on the basis of the existence of a fiscal crisiscreated by its own voluntary conduct. United Firefighters, at 259 Cal.Rptr.74 (court citing Sonoma County Organization ofPublic Employees v. County of Sonoma, 591 P.2d 1, 23 Cal.3d 296,313 [1979]). In reaching its holding, the court found that the City of Los Angeles had failed to assume realistic projections of annual increases in the consumer price index and failed to consider the impact of active pension systems' members annual salary increases.
[16] The Singer Court stated that "there is no evidence that the city will not be able to meet its obligations in the future, no evidence that plaintiffs pensions are in jeopardy, no evidence that plaintiffs would receive any benefit from an actuarially sound system which plaintiffs would otherwise not receive. We agree that there were valid reasons for the Legislature to require pension plans to be actuarially sound; but the change has not shown to be a benefit to these plaintiffs." Singer,607 P.2d at 476.
[17] See also Woods v. City of Lawton, 845 P.2d 880, 883
(Okla. 1992), wherein the Oklahoma Supreme Court stated that "[t]he rights of a government employee are defined by the limits of the contract."
[18] See McDermott v. Regan, 24 N.E.2d 985, 989 (N.Y.App. 1993), wherein the court found that modifications to theemployer contribution funding statutes by the New YorkLegislature for the state retirement plan constituted anunconstitutional impairment of contract and a breach of theLegislature's fiduciary duty to public employees when the onlyfactor it considered in amending the funding method for employerswas that of the fiscal crisis facing the State at the time. The court held that where the State maintains some independent authority and flexibility regarding administration of a public retirement plan and specifically prescribes procedures for funding the plan, the legislature remains bound by the same fiduciary duties required of any other acting in a fiduciary capacity, those of protecting the interest of the beneficiary.Id.
[19] The West Virginia Supreme Court also held that the payment of statutory retirement benefits, in addition to being a general obligation, constitutes a "moral" obligation of the State. See,Dadisman I, at 384 S.E.2d 829.
[20] See also Opinion of the Justices, 303 N.E.2d 329-30
(Mass. 1973), wherein the Massachusetts Supreme Court stated "the maintenance of a retirement plan is heavily burdening a governmental unit has not itself been permitted to serve as justification for a scaling down of benefits figuring in the `contract.'"
[21] Subsequent to the issuance of A.G. Opin. 81-53, the Legislature's power to levy additional taxes was procedurally modified. See Okla. Const. art. V, § 33.
[22] It must be noted that while various political subdivisions in Oklahoma may levy ad valorem taxes, the State of Oklahoma is prohibited on the state level from levying such taxes for state purposes. Okla. Const., art. 10, § 9(a).